**Slip Op 10-68**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Nicholas Tsoucalas, Senior Judge**

—————————————————————————— :
:
SAHAVIRIYA STEEL INDUSTRIES PUBLIC :
COMPANY LIMITED, :
:
      Plaintiff, :
:
      v. :
:
UNITED STATES, : Court No. 09-00229
: **PUBLIC VERSION**
      Defendant, :
:
      and :
:
UNITED STATES STEEL CORPORATION, :
:
      Defendant-Intervenor. :
—————————————————————————— :

<u>**OPINION**</u>

**Held**: Plaintiff's Motion for Judgment On the Agency Record is denied. Judgment is entered for Defendant, United States. Case is dismissed.

Dated: June 15, 2010

    <u>Hughes Hubbard & Reed LLP</u>, (<u>Kenneth J. Pierce</u>, <u>Robert L. LaFrankie</u>, <u>Victor S. Mroczka</u>) for Sahaviriya Steel Industries Public Company Limited, Plaintiff.

    <u>Tony West</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Michael D. Panzera</u> and <u>Jane C. Dempsey</u>); <u>Aaron P. Kleiner</u>, Office of Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for the United States, Defendant.

    <u>Skadden, Arps, Slate, Meagher & Flom LLP</u>, (<u>Jeffrey D. Gerrish</u> <u>Robert E. Lighthizer</u>, and <u>Nathaniel B. Bolin</u>) for United States Steel Corporation, Defendant-Intervenor.

**TSOUCALAS, Senior Judge:** This matter is before the Court on a Motion for Judgment On the Agency Record brought by Plaintiff, Sahaviriya Steel Industries ("SSI"), pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("USCIT").

Plaintiff challenges certain aspects of the U.S. Department of Commerce's ("Commerce's" or "Department's") final results with respect to the changed circumstances review of the antidumping duty order in Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Final Results of Antidumping Duty Changed Circumstances Review and Reinstatement in the Antidumping Duty Order, 74 Fed. Reg. 22,885 (May 15, 2009) Public Rec. Doc. No. 1180 ("Final Results").[1] Plaintiff contends that the Department lacks the authority to conduct a changed circumstances review for the purpose of reinstating a "previously revoked" antidumping duty order. Mem. in Supp. of Pl.'s Mot. for J. On the Agency R. ("Pl.'s Brief") at 2. Plaintiff further contests the Department's date of sale methodology and argues that Commerce acted unlawfully when it changed its previous practice of relying on the contract date as the date of sale for its margin calculations. See id. at 3.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (2006) and 28 U.S.C. § 1581(c) (2006).

---

[1] Hereinafter all documents in the public record will be designated "PR," and all documents in the confidential record designated "CR."

### STANDARD OF REVIEW

When reviewing the final results in an antidumping changed circumstances review "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). There must be a "rational connection between the facts found and the choice made" in an agency determination if it is to be characterized as supported by substantial evidence and otherwise in accordance with law. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). The Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation marks omitted).

When the Court examines the lawfulness of Commerce's statutory interpretations and regulations, it must employ the two-pronged test established in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). First, the Court must

examine "whether Congress has directly spoken to the precise question at issue." Id. at 842. If it has, the agency and the Court must comply with the clear intent of Congress. See id. at 842-43. If it has not, the question for the Court is "whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

## BACKGROUND

On November 29, 2001, Commerce issued an antidumping duty order on certain hot-rolled carbon steel flat products from Thailand. See Antidumping Duty Order: Certain Hot-Rolled Carbon Steel Flat Products From Thailand, 66 Fed. Reg. 59,562 (Nov. 29, 2001). The order was based on separate findings by Commerce and the U.S. International Trade Commission ("ITC" or "Commission") that certain hot-rolled steel from Thailand had been sold in the United States at less than fair value and contributed to the material injury suffered by the domestic hot-rolled steel industry. See id. at 59,563. SSI was among the Thai producers of subject merchandise included in the antidumping duty order. See id.

Following its issue, Commerce conducted a series of administrative reviews of the order in which it determined that SSI had not sold hot-rolled steel at less than normal value. See Certain Hot-Rolled Carbon Steel Flat Products From Thailand: Final Results and Partial Rescission of Antidumping Duty Administrative Review, 69 Fed. Reg. 19,388 (Apr. 13, 2004); Certain Hot-Rolled

Carbon Steel Flat Products from Thailand: Rescission of Antidumping Duty Administrative Review, 69 Fed. Reg. 18,349 (Apr. 7, 2004) (this second administrative review was rescinded when the parties requesting the review withdrew their requests); Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Final Results of Antidumping Duty Administrative Review, Partial Revocation of Antidumping Duty Order and Partial Rescission of Antidumping Duty Administrative Review ("Final Results of Third Administrative Review"), 71 Fed. Reg. 28,659 (May 17, 2006). In November 2004, as part of its request to conduct the third administrative review, SSI sought partial revocation of the order with respect to its sales pursuant to 19 C.F.R. § 351.222 (2004). In support of its request, SSI agreed "to immediate reinstatement of the order, so long as any Thai exporter or producer is subject to it, should the Department determine that SSI, subsequent to the requested revocation, sold the subject merchandise at less than fair value." Request For Changed Circumstances Review On Behalf Of United States Steel Corp. (Nov. 8, 2006), Ex. 1 at 3 (PR 721).

Upon completion of the third administrative review, Commerce revoked the antidumping duty order for SSI's exports of hot-rolled steel.[2] See Final Results of Third Administrative Review, 71 Fed. Reg. 28,661. Commerce's decision was based on its determination

---

[2] This revocation was made effective November 1, 2004. See Memorandum to File Regarding Effective Date of Revocation for SSI (May 23, 2006).

that SSI had sold the subject merchandise at not less than normal value for a period of three consecutive years. Despite partial revocation of the antidumping order with respect to SSI, the order itself remained in effect as to other Thai producers and exporters. See Certain Hot-Rolled Carbon Steel Flat Products from India, Indonesia, the People's Republic of China, Taiwan, Thailand, and Ukraine: Continuation of Antidumping Duty and Countervailing Duty Orders, 72 Fed. Reg. 73,316 (Dec. 27, 2007).

On November 8, 2006, United States Steel Corporation ("U.S. Steel") filed with Commerce an allegation claiming SSI had resumed sales of hot-rolled steel products at less than normal value subsequent to its removal from the original antidumping order. Invoking 19 C.F.R. § 351.216(b),[3] U.S. Steel requested that Commerce initiate a changed circumstances review to reinstate the order with regard to SSI's exports of subject merchandise to the United States. Accordingly, Commerce conducted an analysis of the information it received from U.S. Steel to determine the sufficiency of its allegations. On March 28, 2008, the Department, relying on its authority under 19 U.S.C. § 1675(b)(1), initiated the underlying changed circumstances review to determine whether SSI had sold hot-rolled steel at less than normal value during the

---

[3] 19 C.F.R. § 351.216(b) allows an interested party to request a changed circumstances review of an antidumping duty order.

period in question,[4] and whether it should therefore be reinstated in the original antidumping duty order. See Initiation of Antidumping Duty Changed Circumstances Review: Certain Hot-Rolled Carbon Steel Flat Products from Thailand ("Notice of Initiation"), 73 Fed. Reg. 18,766 (Apr. 7, 2008).

On October 7, 2008, SSI commenced an action with this Court seeking injunctive relief to prevent the Department from continuing with its changed circumstances review. Attempting to invoke the Court's jurisdiction under 28 U.S.C. § 1581(i), SSI challenged the Department's initiation of the changed circumstances review for the purpose of reinstating a previously revoked antidumping duty order, as unlawful and ultra vires. See Sahaviriya Steel Indus. Co., Ltd. v. United States, 33 CIT ___, 601 F. Supp. 2d 1355 (2009) ("SSI I"). The Court granted Commerce's motion to dismiss based on the lack of subject matter jurisdiction and because SSI's claims were not yet ripe. See id.

On May 15, 2009, the Department published the Final Results of its changed circumstances review in which it determined that SSI had resumed dumping of hot-rolled steel products, and reinstated Plaintiff under the antidumping duty order still in effect. A dumping margin of 9.04 percent ad valorem was calculated for all entries of subject merchandise produced by SSI. See Final Results,

_____

[4] The period of review is July 1, 2006, through June 30, 2007.

74 Fed. Reg. at 22,886.

Plaintiff commenced this action on June 11, 2009, seeking judicial review of Commerce's Final Results in the changed circumstances review ("CCR" or "changed circumstances review"). Specifically, Plaintiff contests the legality of the Department's initiation of a changed circumstances review for the purpose of reinstating a previously revoked antidumping duty order, and the methodologies employed by Commerce to determine the dumping margin and cash deposit rate. See Compl. ¶ 24.

**DISCUSSION**

1. **Commerce's Use of a CCR for Reinstatement of a Partially Revoked Antidumping Duty Order**

   **A. Plaintiff's Arguments**

   The gravamen of Plaintiff's argument is that Commerce lacks the statutory authority to support its initiation and conduct of a changed circumstances review for the purpose of reinstating a partially revoked antidumping duty order. See Pl.'s Brief at 15. According to SSI, there are only two statutory provisions which affect the manner in which a changed circumstances review is conducted. The first, section 1675(b),[5] expressly limits the

---

[5] The relevant portions of 19 U.S.C. § 1675(b) state:

Reviews based on changed circumstances

(1) In general
   Whenever the administering authority or the Commission receives information concerning, or a request from an interested party for a review of-

Department's authority to review three types of agency decisions, none of which is a previous determination to revoke an antidumping duty order. See id. Plaintiff argues that, as it relates to this litigation, section 1675(b) only allows Commerce to conduct a changed circumstances review of "a final affirmative determination that resulted in an antidumping duty order" provided there are changed circumstances sufficient to warrant such a review. 19 U.S.C. § 1675(b)(1)(A); see also Pl.'s Brief at 15-16. As SSI explains it, there are only two final affirmative determinations that result in an antidumping duty order; a final dumping determination made by Commerce in a less-than-fair value investigation; and a final injury determination made by the ITC. See Pl.'s Brief at 16. Nowhere does the statute suggest a unilateral authority to review a determination of revocation as proffered by Commerce. See id. Thus, SSI concludes, because the underlying changed circumstances review does not involve a review of any of the authorized determinations listed in section 1675(b),

---

(A) a final affirmative determination that resulted in an antidumping duty order under this subtitle . . . ,

(B) a suspension agreement accepted under section 1671c or 1673c of this title, or

(C) a final affirmative determination resulting from an investigation continued pursuant to section 1671c(g) or 1673c(g) of this title,

which shows changed circumstances sufficient to warrant a review of such determination . . ., the administering authority . . . shall conduct a review of the determination[.]

Commerce exceeded its statutory authority. See id. at 17.

Plaintiff further argues that, as presently constructed, the statute is an unambiguous declaration by Congress limiting Commerce's authority to conduct a changed circumstances review to those instances where revocation of an existing order is contemplated. See id. Plaintiff points to the text of the statute as evidence "that Congress did not intend to authorize the Department to reinstate an order with respect to merchandise covered by a revocation." Pl.'s Brief at 15. Therefore, any deference afforded the agency under Chevron, is mooted as the Court "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. In addition, SSI cites to portions of the legislative history purporting to show that Congress never intended to endow Commerce with the authority to conduct a changed circumstances review for the purpose of reinstating a previously revoked antidumping duty order. See Pl.'s Brief at 19. Plaintiff draws this conclusion based upon Congress' failure to specifically provide for the reinstatement of an antidumping duty order notwithstanding the numerous opportunities it had to do so. See id. at 18-19.

Plaintiff looks to section 1675(d)(1) as the only other provision in the statute that affects the conduct of a changed

circumstances review.[6] According to SSI, the omission of any reference to "reinstatement" in the statutory text is evidence of the legislature's intent to limit Commerce's use of a changed circumstances review solely for revocation purposes, not reinstatement. See id. at 20. In light of this unequivocal statement by Congress, the argument goes, any inquiry under Chevron should end at the first prong analysis.[7] See id. Moreover, Plaintiff claims, when Commerce revokes an antidumping duty order in whole, the order ceases to exist and cannot later be reinstated. See id. Therefore, because section 1675(d) does not distinguish between partial and total revocation, the effect is the same for both procedures. Under partial revocation, the part of the order that was revoked ceases to exist, and the Department may not reinstate the order over merchandise covered by that revocation. See id. To further illustrate this point, SSI references the

---

[6] Section 1675(d)(1) states in part that:

> The administering authority may revoke, in whole or in part, . . . an antidumping duty order . . . after review under subsection (a) [administrative review] or (b) [changed circumstances review] of this section.

[7] As directed by the Supreme Court, a reviewing court must first consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

Department's own regulations which define the term "revocation" as the end of an antidumping proceeding.[8] See id. at 21.

Next, Plaintiff challenges the Department's assertion that its reinstatement regulation, 19 C.F.R. § 351.222(b) and (e), is a reasonable exercise of its statutory authority to revoke and later reinstate an antidumping duty order. See id. SSI takes particular issue with Commerce's rationale that reinstatement is the "natural corollary" to revocation, and explains that the Department's regulations cannot provide the agency with a level of authority not contemplated by the statute. See id. at 22. For example, the regulation's requirement that a respondent agree in writing to immediate reinstatement if the Department later concludes that the exporter or producer has resumed dumping subsequent to revocation, cannot confer upon Commerce the legal authority it lacks under the statute. See id. Moreover, claims Plaintiff, even if the Court were to afford the Department's actions deference under Chevron, they would still fail because Chevron only defers to the agency in its interpretation of statutes, "not in creating statutory authority where none exists." Id. at 23 (emphasis omitted).

---

[8] The relevant portion of 19 C.F.R. § 351.222(a) reads as follows:

> Revocation of orders; termination of suspended investigations.

(a) Introduction. "Revocation" is a term of art that refers to the end of an antidumping or countervailing proceeding in which an order has been issued.

Plaintiff relies on this Court's decision in <u>Asahi Chemical Indus. Co. Ltd., v. United States</u>, 13 CIT 987, 727 F. Supp. 625 (1989), as further evidence that section 1675(b) precludes Commerce from reinstating an order against merchandise that was previously revoked. <u>See</u> <u>id.</u> at 23-24. The Court in <u>Asahi</u> examined the Department's reinstatement regulation in effect at the time, 19 C.F.R. § 353.54(e) (1988), and whether its requirement that a party agree to immediate suspension of liquidation and reinstatement of the antidumping duty order was enforceable.[9] SSI interprets the Court's holding in <u>Asahi</u> as standing for the proposition that revocation of the antidumping order renders the order moot with respect to the merchandise covered by the previous revocation. <u>See</u> <u>id.</u> at 24. Therefore, "once the Department makes a revocation determination, 'the antidumping duty order ceases to be operative and may not be reinstated.'" <u>Id.</u> (quoting <u>Asahi</u>, 13 CIT at 990, 727 F. Supp. 625, 628). Plaintiff maintains that the Department's current regulation, 19 C.F.R. § 351.222(b)(2)(i)(B), is "substantively no different from the regulation at issue in <u>Asahi</u>,"

---

[9] Commerce's previous regulation read in pertinent part:

Before the Secretary may tentatively revoke a Finding or an Order . . . the parties who are subject to the revocation . . . must agree in writing to an immediate suspension of liquidation and reinstatement of the Finding or Order . . . if circumstances develop which indicate that the merchandise thereafter imported into the United States is being sold at less than fair value. 19 C.F.R. § 353.54(e).

id., and contains the same defects identified by the Court in that case,[10] see id. at 25-26. Namely, the regulation abrogates the statutory requirement of affirmative dumping and injury determinations necessary to impose duties, and fails to address the interrelationship between reinstatement and the existing statutory framework for imposing duties. See id. Therefore, Plaintiff concludes, the Court's holding in Asahi is equally applicable here, and eliminates the Department's legal authority to reinstate the order over SSI. See id. at 27.

### B. Defendant's Arguments

Defendant counters that, under the doctrine of collateral

---

[10] Commerce's current reinstatement regulation provides in part:

In determining whether to revoke an antidumping duty order in part, the Secretary will consider:

(A) Whether one or more exporters or producers covered by the order have sold the merchandise at not less than normal value for a period of at least three consecutive years;

(B) Whether, for any exporter or producer that the Secretary previously has determined to have sold the subject merchandise at less than normal value, the exporter or producer agrees in writing to its immediate reinstatement in the order, as long as any exporter or producer is subject to the order, if the Secretary concludes that the exporter or producer, subsequent to the revocation, sold the subject merchandise at less than normal value; and

(C) Whether the continued application of the antidumping duty order is otherwise necessary to offset dumping.

19 C.F.R. § 351.222(b)(2)(i).

estoppel, SSI is precluded from making the argument that Commerce lacks the authority to conduct a CCR for purposes of reinstating an antidumping duty order. See Def.'s Resp. to Pl.'s Mot. for J. Upon the Agency R. ("Def.'s Brief") at 8. According to Commerce, the Court in SSI I, "specifically ruled upon the merits and settled the issue as a matter of law." Id. As a result, the doctrine of issue preclusion applies and relitigation of this matter cannot proceed.

Defendant further opines that, even assuming collateral estoppel does not apply, Commerce's reinstatement efforts derive from and are consonant with its statutory authority. See id. at 9. This, says Defendant, was the holding of the Court in SSI I, which also affirmed the agency's promulgation of 19 C.F.R. § 351.222(b)(2)(i), giving effect to the agency's authority to reinstate. See id. The Department acknowledges that section 1675(b)(1) does not expressly authorize a changed circumstances review for reinstatement, nevertheless, it is Commerce's position that there is "binding precedent" for such an expansive view of this section of the statute. Id. at 12. Commerce relies on the Federal Circuit's holding in Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352 (Fed. Cir. 2008) for the proposition that "Commerce's authority to conduct changed circumstances reviews under section 1675(b) is not limited to the circumstances described in the statute, and . . . encompasses a determination to reinstate an antidumping duty order." Id.

As evidence that the Department's actions in this review are consistent with its past practice, Defendant offers two proceedings in which, after conducting a changed circumstances review, Commerce reinstated a company under a partially revoked antidumping duty order.  See id. at 13-14; see also Sebacic Acid from the People's Republic of China: Final Results of Antidumping Duty Changed Circumstances Review and Reinstatement of the Antidumping Duty Order, ("Sebacic Acid") 70 Fed. Reg. 16,218 (Mar. 30, 2005); Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea: Final Results of Antidumping Duty Changed Circumstances Review and Reinstatement of the Antidumping Duty Order, ("PET Film") 73 Fed. Reg. 18,259 (Apr. 3, 2008).

With regard to section 1675(d)(1), Defendant, once again, concedes that the statute "is silent with respect to Commerce's exercise of its revocation power."  Def.'s Brief at 15.  However, the Department maintains that its "authority to reinstate an exporter or producer in the antidumping order derives from its authority to revoke the antidumping order in part as to that particular exporter or producer."  Id.  Because section 1675(d)(1) provides for revocation "in whole or in part," the argument goes, Commerce is entitled to resolve the ambiguity created by the statute's failure to define this term.  Id. (quoting 19 U.S.C. § 1675(d)(1)).  Towards this end, Commerce promulgated 19 C.F.R. § 351.222 in order to administer the procedure for withdrawing

partial revocation "by means of reinstating companies in an order that remains in effect for other producers or exporters." Id. As the Department further explains, it "interpreted the authority to partially revoke the antidumping duty order with respect to a particular company it finds to be no longer dumping to include the authority to impose a condition that the partial revocation may be withdrawn." Id. at 16 (quoting Initiation of Antidumping Duty Changed Circumstances Review: Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 73 Fed. Reg. 18,770 (Apr. 7, 2008)). Similar to its previous argument, Commerce construes the Court's holding in SSI I as affirming this grant of authority. See id. at 18. Having already determined that its actions regarding reinstatement are statutorily based, Commerce dismisses as meritless, Plaintiff's claim that the certification signed by SSI cannot confer upon Commerce any authority beyond that provided by law. See id. at 19. As to the absence of any distinction between partial and total revocation of an order in the language of section 1675(d)(1), Defendant argues that the presence of the term "'in whole or in part' expressly contemplates two types of revocation: total revocation and partial revocation." Id. at 21. Thus, because partial revocation assumes the continued operation of the antidumping duty order, at least with respect to other producers or exporters, Commerce has not relinquished jurisdiction over this still functional order. See id. Therefore, Defendant

concludes, there is "no need to undertake a new investigation because the order remain[s] in effect." Id.

Insofar as the Plaintiff relies on this Court's decision in Asahi, Defendant argues two points of error. First, based upon the Court's ruling in SSI I, "the question as to whether Asahi has any bearing upon whether Commerce acted ultra vires has [already] been decided in favor of the United States." Id. at 22. Second, even assuming Asahi were relevant, Commerce's current reinstatement regulation has since been substantively amended, curing each of the defects identified by the court in that case.[11] See id. Consequently, the Department offers an interpretation of Asahi that does not invalidate the agency's authority to order reinstatement.

## C. Analysis

As a threshold matter, Defendant invokes the well-established principle of collateral estoppel in claiming that Plaintiff is precluded from relitigating matters already decided against them in SSI I, specifically whether Commerce lacks the authority for reinstatement pursuant to sections 1675(b) and (d). Under the doctrine of collateral estoppel, or issue preclusion, a litigant

---

[11] The Asahi court identified three specific concerns with Commerce's prior reinstatement regulation; 1) the regulation did not specify the circumstances under which Commerce was to consider reinstatement; 2) the regulation did not specify the type of investigation necessary for reinstatement; and 3) the regulation failed to address the interrelationship between reinstatement and the existing statutory framework. See Asahi, 13 CIT at 991, 727 F. Supp. 625, 628.

who has litigated an issue in a full and fair proceeding is estopped from relitigating the same issue in a subsequent proceeding. See Thomas v. Gen. Servs. Admin., 794 F.2d 661, 664 (Fed. Cir. 1986). Four conditions must be satisfied before a party can seek to apply collateral estoppel; (1) the issue or fact previously adjudicated is identical with the one now presented; (2) the issue or fact was actually litigated in the prior case; (3) resolution of the issue or fact was essential to a final judgment in the first action; and (4) the party against whom preclusion is applied had a full and fair opportunity to litigate the particular issue or fact. See id.

In addressing the first and second prongs of the Thomas test, the Court finds that the legal issue presented here is not identical to the issue actually litigated in SSI I. While it is true that Plaintiff, in SSI I, urged review of the agency's reinstatement authority, it did so under the premise of an ultra vires rationale. The Court was careful to make the distinction between a claim of ultra vires agency conduct, and one that merely amounted to a "mistake of law." SSI I, 33 CIT at ___, 601 F. Supp. 2d 1355, 1367. As the Court noted:

> An ultra vires claim cannot be construed to allege that Commerce promulgated its reinstatement regulation based on an erroneous interpretation of the statute, but rather that Commerce acted outside the scope of its authority, and was without any legal basis to make that interpretation at all. Plaintiff's effort at recasting its ultra vires argument, merely amounts to a claim that Commerce committed a "mistake of law" in promulgating the

reinstatement regulation, not that the Department acted "completely outside [its] governmental authority."

Id. (quoting State of Alaska v. Babbitt, 67 F.3d 864, 867 (9th Cir. 1995)).  The Court ultimately concluded that:

> [S]hould Commerce decide to reinstate the partially revoked antidumping duty order as to SSI, Plaintiff will have the opportunity to bring an action challenging those results.  In such an action, SSI is entitled to contest "any factual findings or legal conclusions upon which the determination is based," 19 U.S.C. § 1516a(a)(2)(A), including the statutory and regulatory bases for the Department's initiation of the changed circumstances review.

Id. at 1369.  Hence, the issue, in SSI I, of whether or not Commerce was empowered to engage in the challenged course of conduct in the first place is different from the issue of whether Commerce's reinstatement of a partially revoked antidumping duty order was an errant application of the statute.  Therefore, Plaintiff's claim is not barred by the doctrine of collateral estoppel.

At its core, this case revolves around the issue of whether Commerce has the authority, under 19 U.S.C. § 1675(b) and (d), to initiate a changed circumstances review for purposes of reinstating a previously revoked antidumping duty order.  Plaintiff argues that the authority granted by Congress under section 1675(b) and (d) is exclusive to the explicit textual content of these provisions.  In other words, because the statute did not expressly provide for reinstatement via a changed circumstances review or through any other mechanism for that matter, Congress' grant of authority is

restricted to review of only those specific types of final determinations listed therein (i.e., under section 1675(b)(1)), and is otherwise intended only to allow the Department to <u>revoke</u> existing orders (i.e., under section 1675(d)), not reinstate them. Moreover, Plaintiff asserts, Congress has directly spoken to the issue, therefore, <u>Chevron</u> deference does not apply. The Court disagrees. In determining whether an agency's interpretation and application of a statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by <u>Chevron</u>. <u>Chevron</u>, 467 U.S. at 837. The first <u>Chevron</u> step is to determine whether "Congress has directly spoken to the precise question at issue." <u>Id.</u> at 842. Employing traditional tools of statutory construction, the Court looks first to the text of the statute. <u>See</u> <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998). Because the "statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter." <u>Id.</u> at 882. If, however, the statute's text does not explicitly address the question at issue, the Court must seek to determine whether Congress had an intent on the matter. <u>See id.</u> Only if after this investigation the Court is still at a loss as to what Congress intended does the second prong of <u>Chevron</u> apply.

A review of 19 U.S.C. § 1675(b)(1) does not support the suggestion that Congress intended to circumscribe the changed circumstances review process to only those determinations listed

therein. Neither the language of the statute nor the legislative history expressly prohibit Commerce from using a CCR for reinstatement purposes. As Defendant points out, this Court has recognized the Department's use of a CCR for purposes other than those listed in the statute. See Def.'s Brief at 12. Plaintiff attempts to distinguish the cases offered by Commerce as inapposite for purposes of comparison to the facts at bar. Specifically, SSI criticizes the Department's application of the Court's holding in Mittal Canada, Inc. v. United States, 30 CIT 1565, 1572 n.7, 461 F. Supp. 2d 1325, 1332 n.7 (2006). In Mittal Canada, the Court recognized as "broad" Commerce's discretion as to the range of matters subject to a changed circumstances review. Id. SSI claims that Mittal Canada, and the cases cited within Mittal Canada,[12] are distinguishable on the grounds that each of the

---

[12] Plaintiff's comments with regard to the Court's characterization, in SSI I, of Jia Farn Mfg. Co., Ltd. v. United States, 17 CIT 187, 817 F. Supp. 969 (1993) deserve some mention in that Jia also serves as one of the seven cases cited within the Mittal Canada opinion. See Pl.'s Reply Brief at 8 n.2. In SSI I, under its discussion of the jurisdictional issue, the Court represented the holding of Jia as one which affirmed Commerce's authority, under section 1675, to reinstate an antidumping duty order. See SSI I, 33 CIT ___, 601 F. Supp. 2d 1355, 1368 n.13. SSI accurately points out that the respondent in Jia was excluded from the original antidumping duty order during the less than fair value investigation. As a result, the question of reinstatement was never before the court. However, the Jia court did examine, and eventually sustained, the agency's authority to place an exporter or producer under an antidumping duty order from which it had been previously excluded. Therefore, while Commerce was not conducting the CCR for purposes of reinstatement, it was contemplating instatement of the respondent under an order already in place as to other companies.

underlying CCR proceedings implicated an order that was in place on the relevant party. See Pl.'s Reply Brief at 7-8. In this way, only the particular application of each order was being considered by Commerce.

This line of reasoning, however, misses the point. These cases are not offered as justification for reinstatement per se, but rather establish a judicial recognition of Commerce's authority to conduct changed circumstances reviews for purposes other than those described in section 1675(b)(1). The existence, or lack thereof, of an antidumping duty order on the affected party does nothing to detract from the argument that the scope of section 1675(b)(1) is not so constrained. The lack of certainty as to whether Congress has directly spoken to this precise issue, compels an examination of whether the Department's interpretation is based on a permissible construction of the statute. In other words, the Court must proceed to the second step of the Chevron analysis.

Under the second step of Chevron, "[a]ny reasonable construction of the statute is a permissible construction." Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (quoting Torrington v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996)).

---

Regardless, Plaintiff's objection to the Court's interpretation of the Jia decision is misplaced. In SSI I, the Court was adducing evidence with regard to jurisdiction, not reinstatement. In fact, the Court in SSI I specifically declined to review Commerce's reinstatement regulation under the guise of a jurisdictional claim. See SSI I, 33 CIT ___, 601 F. Supp. 2d 1355, 1368.

With this as a guide, the courts have accorded particular deference to Commerce in antidumping determinations.  <u>See id.</u>  Here, the wording of section 1675(d) is instructive.  The statute expressly contemplates the revocation "in whole or in part" of an antidumping duty order or "finding."  19 U.S.C. § 1675(d).  Both parties agree that there was only a partial revocation with respect to the merchandise produced and exported by SSI, and that the order remained in effect as to other producers of hot-rolled steel from Thailand.  While this fact, in and of itself, negates Plaintiff's claim that section 1675(d)(1) does not distinguish between total and partial revocation, it also underscores what Commerce actually did in this case.  The removal of SSI from the duties imposed by the order did not serve as a revocation of the order itself, but rather a revocation of the finding that SSI was dumping and therefore liable under the strictures of the order.  In this way, Commerce's reinstatement of SSI to the order from which it was removed is not a reinstatement of the antidumping duty order, but a reinstatement of the finding that SSI was dumping.[13]  Hence, the argument Plaintiff advances that upon revocation an "order ceases to exist and cannot later be 'reinstated'" is without merit.  Pl.'s Brief at 20.  The antidumping duty order is still in effect as to

---

[13] While it is true that Commerce characterizes its initial removal of SSI from the order as a partial revocation, the moniker Commerce attaches does not detract from the legal authority it derives from section 1675(d)(1).

hot-rolled steel from Thailand. The fact that the order remains effective as to other Thai producers defeats Plaintiff's argument of the need for a new investigation. Both the less than fair value determination by Commerce and the injury determination by the ITC continue to support application of antidumping duties on the subject merchandise. Thus, all Commerce has done is to reconsider its determination as to whether or not SSI has acted in a manner consistent with its original exclusion from the order. See Jia, 17 CIT at 192, 817 F. Supp. 969, 973 ("[T]he exclusion of a firm from the order applies only when the firm acts in the same capacity as it was [when] excluded from the order").

Because the statute does not define "in whole or in part," Commerce filled this statutory gap by promulgating regulations to govern the procedures for partial revocation of an order or finding. The mechanism by which Commerce chose to accomplish this is 19 C.F.R. § 351.222. Commerce explains that the rationale underlying this procedure is to ensure that injurious dumping is remedied, especially under circumstances, such as those present here, where a party removed from an antidumping order subsequently resumes dumping. Without such procedures, it is conceivable that a respondent company could evade penalty by curbing its dumping activity for the requisite period of time in order to seek removal from the order and after having done so, return to making sales at below normal value. The reasonableness of this concern is embodied

in the fact that SSI willingly entered into an agreement allowing its reinstatement under the order. Although SSI now claims that it only agreed to reinstatement pursuant to a new investigation, this claim is inconsistent with Plaintiff's acquiescence to "immediate reinstatement of the order, so long as any Thai producer is subject to it." Request For Changed Circumstances Review On Behalf Of United States Steel Corp. (Nov. 8, 2006), Ex. 1 at 3 (PR 721). Plaintiff fails to explain why, if reinstatement could only be effected through a new investigation, the company agreed to predicate reinstatement on the condition that the order remain in effect. The Court interprets Plaintiff's acceptance of the terms of the reinstatement agreement as its accedence to the reasonableness of the practice.

Plaintiff's reliance on the Court's decision in Asahi is similarly flawed. The Court's principal objection to the regulation at issue in Asahi was the degree to which the provision's ambiguity made any standard for reinstatement conjectural. See Asahi, 13 CIT at 991, 727 F. Supp. 625, 628. Specifically, 19 C.F.R. § 353.54(e) did not; (1) describe the circumstances under which Commerce would consider reinstatement; (2) specify the type of investigation necessary for reinstatement; or (3) speak to the inter-relationship between reinstatement and the existing statutory framework. See id. Under the terms of 19 C.F.R. § 353.54, it was theoretically possible for Commerce to

impose antidumping duties without the benefit of an extant antidumping duty order. This, the <u>Asahi</u> court found, was impermissible. Commerce has since amended its reinstatement regulations with the most significant change coming in the form of the conditional requirement that reinstatement be considered only if an exporter or producer is still subject to the order. With this change, Commerce has addressed two of the concerns evoked in <u>Asahi</u>. Namely, the circumstances under which reinstatement can proceed are now elucidated, as is the inter-relationship between reinstatement and the existing statutory framework. The stipulation requiring an order to remain in effect as to other exporters or producers before reinstatement can be contemplated speaks to the necessity of two affirmative findings; a finding of dumping by Commerce and a separate finding of material injury by the ITC. It also serves as notice to those seeking partial revocation of the conditions precedent necessary for reinstatement.

In light of the above, the Court finds that Commerce's rationale and interpretation of section 1675(b) and (d) are reasonable within the <u>Chevron</u> framework, supported by substantial evidence on the record and otherwise in accordance with law.

2.   **Commerce's Use of Invoice Date Rather Than Contract Date as U.S. Date of Sale**

   A.   **Plaintiffs' Arguments**

SSI complains that Commerce acted arbitrarily when it changed its U.S. date of sale methodology. Rather than relying on the

contract date, as was done in previous segments of this proceeding, Commerce instead used invoice date in the date of sale analysis. See Pl.'s Brief at 28-29. SSI alleges that had the Department adhered to its longstanding practice of relying on respondent's contract date, SSI would have no antidumping duty margin. See id. at 28. Hence, Commerce would have been precluded from reinstating the order as to SSI. Acknowledging the regulatory preference for use of invoice date as the date of sale, Plaintiff points out that this same regulation provides for use of a date other than invoice date, if the Secretary is satisfied that a different date better reflects the date on which the material terms of sale are established.[14] See id. at 29. Because SSI's contract dates better reflect the date on which the material terms of its U.S. sales were established, Commerce erred by not relying on those reported dates as it had done in the four previous segments of this proceeding. See id.

Plaintiff avers that date of sale issues are typically resolved by examining the significance of any changes to the

_____

[14] 19 C.F.R. § 351.401(i) provides:

Date of sale. In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

material terms of sale involved.  <u>See id.</u>  In other words, the Department should have examined whether or not the material terms of sale underwent any meaningful changes between the contract date and date of invoice, before it deviated from using contract date as the U.S. date of sale.  SSI identifies <u>Notice of Final Results of Antidumping Duty Administrative Review and Final Partial Rescission: Certain Cut-to-Length Carbon Steel Plate from Romania</u>, 72 Fed. Reg. 6,522 (Feb. 12, 2007) ("<u>Steel Plate from Romania</u>") as an instance in which the Department has previously concluded that the use of invoice date is not appropriate when there are only minor changes in quantity between an order acknowledgment and invoice.

SSI references another administrative decision by Commerce, in which the agency declared that "a change in aggregate quantity does not, in and of itself, necessarily constitute a meaningful change to the material terms of sale."  Final Results of Redetermination Pursuant to Second Remand, <u>Nakornthai Strip Mill Public Co. Ltd. v. United States</u>, Court No. 07-00180, p.3 (Feb. 9, 2009); <u>see also</u> Pl.'s Brief at 30.  Therefore, because Plaintiff's U.S. sales process has remained the same throughout, resulting in only minor changes in the aggregate quantity shipped, and Commerce has relied on contract date as the date of sale in all previous segments of this proceeding, the Department's decision to change from contract date to invoice date is unsupported by substantial evidence.  <u>See</u>

id. at 30-33.

Lastly, it is SSI's position that "important policy reasons" exist as to why contract date is the appropriate U.S. date of sale in the underlying changed circumstances review. Id. at 34. To begin with, Plaintiff maintains that it has complied with all requests and cooperated fully in every segment of this proceeding, and acted consistent with established Department precedent. See id. Additionally, "the recording of final contract date is consistent with the Department's position as to what is considered a 'meaningful' change in material terms." Id. For instance, the changes in shipment quantity under SSI's contract sales were not "meaningful in relation to the total quantity of U.S. sales." Id. at 33. Therefore, if, despite this, invoice date continues to be the U.S. sale date, "contract terms will never be considered set" and Commerce's date of sale regulation will become "meaningless." Id. at 34.

### B. Defendant's Arguments

Commerce defends its use of invoice date as U.S. date of sale, as a proper exercise of the regulatory presumption reflected in 19 C.F.R. § 351.401(i). See Def.'s Brief at 28-29. The regulation's use of the term "normally" establishes invoice date as the presumptive date of sale. 19 C.F.R. § 351.401(i). According to Commerce, this presumption may be overcome if satisfactory evidence is presented establishing the material terms of sale on some other

date.  See id. at 29.  In the underlying changed circumstances review, Commerce alleges that the material contract terms were not set until invoice date because the difference between the quantity ordered and the quantity shipped exceeded the aggregate quantity tolerance level allowed by the contract, thereby constituting changes to the material terms of sale, i.e., price, quantity, delivery, and payment.  As to Plaintiff's insistence that Commerce should have used contract date as the U.S. date of sale because this was the agency's practice in all previous segments of this proceeding, Commerce argues that the agency's "date of sale determination is based upon the facts presented by each review." Id.  Therefore, even if SSI's U.S. sales process has remained unchanged from previous reviews, Commerce's date of sale determination is predicated on the unique facts of this case, not those from earlier determinations.  See id.

With respect to whether the material terms of sale underwent changes sufficient enough to warrant a deviation from contract date as U.S. date of sale, Defendant points to what it considers "[s]ubstantial record evidence [which] demonstrates . . . that SSI had multiple contracts, representing multiple sales, to multiple customers, with final shipment quantities outside of the quantity tolerance specified in the final contract terms."[15]  Id. at 34.

---

[15] Of the [[  ]] total contracts, [[ ]] were found to have exceeded the specified "Delivery Allowance" of [[    ]] provided for in each contract. See Def.'s Brief at 34.

According to Commerce, these changes in delivery terms represent a "substantial variation[] in material terms between the contract date and the invoice date." Id. at 36. Therefore, Commerce's methodology is consistent with the principle that "a party fails to rebut the presumption that date of invoice shall be used where there is a substantial variation between the quantity shipped and the tolerance level specified in a contract." Id. at 38. In this way, the previous administrative proceedings to which Plaintiff refers are factually distinguishable from the circumstances of the present case. See id. at 37.

As a final point, Commerce rejects as irrelevant Plaintiff's contention that the instant case presents important policy considerations. Plaintiff's cooperation, says Commerce, has not been called into question, therefore any such policy considerations are extraneous to the issue of the agency's determination that Plaintiff failed to establish the requisite grounds for use of a date other than invoice date. See id. at 40.

### C. Analysis

The antidumping statute on its face does not specify the manner in which Commerce is to determine the date of sale methodology. The legislative history, however, provides some insight into what Congress intended. As the Statement of Administrative Action accompanying the statute explains, the date of sale is the "date when the material terms of sale are

established." Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. 5110 (H.R. Doc. No. 103-316), reprinted in 1994 U.S.C.C.A.N. 4040, 4153. Hence, Congress has "expressed its intent that, for antidumping purposes, the date of sale be flexible so as to accurately reflect the true date on which the material elements of sale were established." Allied Tube and Conduit Corp. v. United States, 24 CIT 1357, 1370, 127 F. Supp. 2d 207, 219 (2000). Towards this end, Commerce has promulgated regulations which provide that invoice date is the presumptive date of sale, but with an express caveat for situations where another date better reflects the date on which the material terms of sale were established. See 19 C.F.R. § 351.401(i). Thus, Commerce's date of sale regulation provides for a "rebuttable presumption" that invoice date will normally be identified as the date of sale.[16] See Nucor Corp. v. United States, 33 CIT ___, 612 F. Supp. 2d 1264, 1304 (2009). Consequently, unless the party seeking to establish a date of sale other than the invoice date produces sufficient evidence to overcome this presumption, Commerce will use invoice date as the date of sale. This presumption notwithstanding,

---

[16] As support for its presumptive use of invoice date, Commerce explained that: "in many industries, even though a buyer and seller may initially agree on the terms of a sale, those terms remain negotiable and are not finally established until the sale is invoiced. Thus, the date on which the buyer and seller appear to agree on the terms of a sale is not necessarily the date on which the terms of sale actually are established." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,349 (Final Rule) (May 19, 1997).

Commerce does not possess the unfettered discretion to apply invoice date as the date of sale with no regard for the record evidence in a given case. See id. Flexibility is the cornerstone of Commerce's date of sale analysis, and the invoice date presumption is merely a "starting point" in the determination of which date better reflects the date on which the material terms of sale were established. Id. at 1307.

In its interpretation of material terms of sale, the Department's practice has evolved to include price, quantity, delivery terms and payment terms. See SeAH Steel Corp. v. United States, 25 CIT 133, 134 (2001); Nakornthai Strip Mill Public Co. v. United States, 33 CIT ___, 614 F. Supp. 2d 1323, 1334 (2009) ("Nakornthai III"). More recently, however, Commerce has interpreted material terms of sale to include the specification of an aggregate quantity tolerance level because the aggregate quantity tolerance level may be viewed as specifying the amount or quantity of the merchandise to be shipped. See Nakornthai Strip Mill Public Co. v. United States, 32 CIT ___, 558 F. Supp. 2d 1319, 1327 (2008) ("Nakornthai I").

In choosing a date of sale, Commerce weighs the evidence presented and determines the significance of any changes to the terms of sale involved. From the beginning of this changed circumstances review, SSI has argued that any changes made to the contract were minimal and therefore not meaningful in relation to

the total quantity of U.S. sales. In support of this contention, SSI looks to Steel Plate from Romania where Commerce chose to use order acknowledgment date (contract date) as the date of sale even though one sale fell outside of the quantity tolerance limits set in the contracts. See 72 Fed. Reg. 6,522 and accompanying Issues and Decision Memorandum at cmt. 1, p.7. According to SSI, the circumstances in Steel Plate from Romania are essentially the same as those present here, in that the material terms of sale did not undergo any meaningful changes subsequent to the final contract date. The Court disagrees. Although both cases involve sales exceeding the aggregate quantity tolerance level specified in the contracts, Steel Plate from Romania implicated only a single sale within a single contract. See id. at cmt. 1, p.5. Conversely, the instant review involves multiple changes exceeding the contract tolerances of multiple contracts, representing multiple sales to multiple customers. See Memorandum to File from John K. Drury, Analysis Memorandum for the Final Results of Changed Circumstances Review of Certain Hot-Rolled Carbon Steel Flat Products from Thailand: Sahaviriya Steel Industries Public Co., Ltd. ("SSI"), dated May 7, 2009, at p.6 (CR 1178) ("Analysis Memorandum"). Of the [[ ]] contracts examined, the Department found that the quantity tolerance level was exceeded in [[ ]], accounting for

almost [[    ]] of SSI's contracts.[17]  <u>See id.</u>  These changes affected contracts representing [[   ]] of SSI's customer base in the U.S.  <u>See id.</u>  The significance of these changes stand in stark contrast to the lone sale alluded to in <u>Steel Plate from Romania</u>. Despite Plaintiff's assertions to the contrary, it cannot be gainsaid that changes to the material terms of sale occurred after execution of the final sales contract.[18]  The Court, therefore, finds <u>Steel Plate from Romania</u> to be inapposite for purposes of the instant matter.  Neither is the second of the two agency decisions

---

[17] For contract [[                  ]], the final quantity delivered was [[                 ]] than agreed to in the final contract, exceeding the quantity tolerance level of [[       ]]. Contract [[             ]] delivered a final quantity that was [[              ]] than agreed to in the final contract, exceeding the quantity tolerance level of [[       ]]. Contract [[             ]] delivered a final quantity that was [[         ]] than agreed to in the final contract, also exceeding the quantity tolerance level of [[       ]]. <u>See</u> Analysis Memorandum, at p.6 (CR 1178).

[18] SSI reported as the final contract date, the date of final addendum, if an addendum was applicable.

In addition, SSI submitted affidavits from all [[    ]] of its U.S. customers attesting to the fact that "while there might be minor variations to non-material terms in the normal course of business, once the Sales Contract is signed, [customer] understands there can thereafter be no changes to the material terms of sale without an amendment to the contract separately and later agreed to by [customer] and SSI." Response to the Department's Sept. 18, 2008 Third Supplemental Questionnaire Regarding Sections A, B, And C, Ex. S3C-3, ¶ 7 (CR 1031); <u>see also</u> Letter from Sahaviriya Steel Industries to the Department of Commerce, dated Aug. 25, 2008, (CR 1021). While these declarations may establish how the contracting parties intended to proceed, they are not an accurate reflection of their course of conduct.

on which Plaintiff relies instructive here. In <u>Nakornthai</u>, Commerce reasoned that "a change in aggregate quantity shipped is not, on its own, significant and does not, by itself, materially affect the date that the terms of contract were essentially established."[19] Final Results of Redetermination Pursuant to Second Remand, <u>Nakornthai Strip Mill Public Co. Ltd. v. United States</u>, Court No. 07-00180, p.3 (Feb. 9, 2009). This determination was made in the context of changes to the range of quantities purchased for each item within the contract - i.e., the "per item tolerance level." <u>Nakornthai III</u>, 33 CIT ___, 614 F. Supp. 2d 1323, 1326 n.3. As a result, the changes in that case remained within the total aggregate tolerance level provided for by the contract not, as is the case here, outside the total quantity tolerance level specified in the [[    ]] contracts in question. Indeed, Commerce has previously recognized that within tolerance differences do not constitute changes to the material terms of sale. <u>See</u> <u>Notice of Final Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Carbon Steel Flat Products From Thailand</u>, 66 Fed. Reg. 49,622 (Sept. 28, 2001) and accompanying Issues and Decision Memorandum, at cmt. 9 ("With respect to these quantity changes that occurred within such delivery tolerances, we agree . . . that any

---

[19] As Commerce correctly points out, SSI cites to the Department's Final Results of Redetermination Pursuant to Second Remand. This has been superceded by the Court's decision in <u>Nakornthai III</u>, 33 CIT ___, 614 F. Supp. 2d 1323.

differences between the quantity ordered and the quantity shipped which fall within the tolerance specified by the entire contract do not constitute changes in the material terms of sale.").

Equally unconvincing is Plaintiff's argument that the changes in quantity tolerance levels are not meaningful in relation to the total quantity of U.S. sales because they represent only [[     ]] of all quantities ordered in the final contracts.  As U.S. Steel correctly points out, this is not the relevant measure of whether a quantity change is meaningful.  See Mem. in Opp'n to Plaintiff's Mot. for J. On the Agency R. ("Def.-Intervenor's Brief") at 32. Plaintiff's position would render meaningless the quantity tolerance levels negotiated by the contracting parties.  Under this theory, SSI could conceivably exceed the quantity tolerance level of virtually every contract, meriting a 100% non-compliance rate, yet if the impact of these changes on the aggregate quantity and value of all U.S. sales was minor, contract date would still be appropriate for the date of sale analysis. Thus, SSI could effectively evade the mutually agreed upon terms of its contracts and thwart the agency's efforts to calculate a dumping margin as accurately as possible.  This, the Court finds, is simply untenable and cannot be understood as an accurate reflection of when the material terms of sale were established by the parties.

In sum, Plaintiff's assertion that Commerce inappropriately used invoice date as the date of sale holds no merit.  The evidence

necessary to compel rejection of the regulatory presumption in favor of invoice date as the date of sale is conspicuously absent. Furthermore, Commerce's decision to use the invoice date underscores the contracts' lack of finality stemming from sudden changes to the aggregate quantity shipped by Plaintiff, which significantly altered the material terms of sale. It is instances such as this that motivated Congress to grant Commerce the flexibility to choose the date of sale that best reflects the final date on which the material terms of sale were established. Thus, Commerce's decision to proceed with the invoice date as the benchmark for its antidumping determination, despite having applied the contract date in previous reviews, is in accordance with the agency's consistent practice of determining the date of sale based upon the facts specific to each review. Accordingly, the Court finds, as supported by substantial evidence and otherwise in accordance with law, Commerce's date of sale methodology.

The Court takes note of SSI's assertion that there are important policy considerations which support the use of contract date as the appropriate date of sale. Because this argument is not grounded in any legal authority or supported by relevant record evidence, the Court does not specifically address this claim.

## CONCLUSION

For the reasons set forth above, the Motion for Judgment on the Agency Record filed by Sahaviriya Steel Industries is denied. Judgment shall be entered accordingly.

                                    /s/ Nicholas Tsoucalas
                                 **Nicholas Tsoucalas**
                                   **Senior Judge**

Dated: June 15, 2010
       New York, New York