Barnett, Judge:
*1303 Plaintiff Eregli Demir ve Çelik Fabrikalari T.A.S. ("Erdemir") and Consolidated Plaintiffs Çolakoglu Metalurji A.S. and Çolakoglu Dis Ticaret A.S. (together, "Çolakoglu") (collectively, "Plaintiffs"), move, pursuant to United States Court of International Trade ("USCIT" or "CIT") Rule 56.2, for judgment on the agency record, challenging the United States Department of Commerce's ("Commerce" or the "agency") final results in the sales at less than fair value investigation of certain hot-rolled steel flat products from the Republic of Turkey.[1] See Certain Hot-Rolled Steel Flat Products from the Republic of Turkey , 81 Fed. Reg. 53,428 (Dep't Commerce Aug. 12, 2016) (final determination of sales at less than fair value; 2014-2015) (" Final Determination "), ECF No. 41-1, and accompanying Issues and Decision Mem., A-489-826 (Aug. 4, 2016) ("I & D Mem."), ECF No. 41-3, as amended by *1304 Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom , 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016) (am. final affirmative antidumping determinations for Australia, the Republic of Korea, and the Republic of Turkey and antidumping duty orders), ECF No. 41-2.
Erdemir challenges Commerce's determinations regarding its home market and U.S. dates of sale. See Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 52, and Mem. in Supp. of Mot. of Pl. Eregli Demir ve Çelik Fabrikalari T.A.S., for J. Upon the Agency R. Pursuant to Rule 56.2 ("Erdemir Mem."), ECF No. 52-1. Çolakoglu challenges Commerce's determinations regarding duty drawback, indirect selling expenses, corrections to international ocean freight expenses, cost-averaging methodology, and treatment of excess heat as a co-product. See Confidential Pls.' Mot. for J. on the Agency R., ECF No. 53, and Confidential Pls. Çolakoglu Metalurji A.S. and Çolakoglu Dis Ticaret A.S. Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 ("Çolakoglu Mem."), ECF No. 53-1. Defendant United States (the "Government") and Defendant-Intervenors urge the court to sustain Commerce's determinations. See Confidential Def.'s Mem. in Opp'n to Rule 56.2 Mots. for J. on the Agency R. ("Gov. Resp."), ECF No. 59; Confidential Def.-Ints.' Resp. in Opp'n to Pls.' Mots. for J. on the Agency R. ("Def.-Ints. Resp."), ECF No. 61. For the following reasons, the court grants Erdemir's motion as to its home market date of sale. The court further grants Çolakoglu's motion as to duty drawback and corrections to international ocean freight expenses. Plaintiffs' motions are denied in all other respects. The issues upon which the court has granted Plaintiffs' respective motions are remanded to the agency for reconsideration or further explanation.
BACKGROUND
Commerce initiated this anti-dumping duty investigation of hot-rolled steel flat products ("hot-rolled steel") on August 31, 2015 in response to petitions filed by domestic producers of hot-rolled steel. See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom , 80 Fed. Reg. 54,261 (Dep't Commerce Sept. 9, 2015) (initiation of less-than-fair-value investigations; 2014-2015). Commerce selected Çolakoglu and Erdemir as mandatory respondents in the investigation. See Respondent Selection Mem. at 5-6, CJA Tab 1.[2] The period of investigation ("POI") ran from July 1, 2014 to June 30, 2015. Final Determination , 81 Fed. Reg. at 53,428.
On March 22, 2016, Commerce issued its Preliminary Determination . See Certain Hot-Rolled Steel Flat Products From the Republic of Turkey , 81 Fed. Reg. 15,231 (Dep't Commerce March 22, 2016) (aff. prelim. determination of sales at less than fair value; 2014-2015), and accompanying Preliminary Decision Mem., A-489-826 ("Prelim. Mem."), CJA Tab 19, PJA Tab 19, PR 252, ECF No. 69-1.
Commerce conducted sales verifications of Çolakoglu and Erdemir in Istanbul, Turkey from March 28 through April 8, 2016, and of Çolakoglu in Houston, Texas, from May 5 through May 7, 2016. I & D Mem. at 2. Commerce conducted cost verifications of Erdemir in Eregli, Turkey, from April 18 to April 22, 2016, and of Çolakoglu in Istanbul, Turkey, from April 25 to April 29, 2016. Id. at 2.
On August 4, 2016, Commerce issued its Final Determination . See Final Determination , 81 Fed. Reg. at 53,428. In the *1305 Final Determination , Commerce calculated a weighted-average dumping margin of 3.66 percent for Erdemir and 7.15 percent for Çolakoglu. 81 Fed. Reg. at 53,429.
On October 14, 2016, Erdemir timely instituted this action. See Summons, ECF No. 1. On October 28, 2016, Çolakoglu also filed suit challenging the Final Determination . See Summons, ECF No. 1 (Court No. 16-232). On January 18, 2017, the court consolidated the two actions. See Order (Jan. 18, 2017), ECF No. 45.[3]
JURISDICTION AND STANDARD OF REVIEW
The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[4] and 28 U.S.C. § 1581(c) (2012).
The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Huaiyin Foreign Trade Corp. (30) v. United States , 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB. , 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) ). It "requires more than a mere scintilla," but "less than the weight of the evidence." Nucor Corp. v. United States , 34 CIT 70, 72, 675 F.Supp.2d 1340, 1345 (2010) (quoting Altx, Inc. v. United States , 370 F.3d 1108, 1116 (Fed. Cir. 2004) ). In determining whether substantial evidence supports Commerce's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.' " Nippon Steel Corp. v. United States , 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States , 744 F.2d 1556, 1562 (Fed. Cir. 1984) ). However, that a plaintiff can point to evidence that detracts from the agency's conclusion or the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (citing Consolo v. Fed. Mar. Comm'n , 383 U.S. 607, 619-20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) ). The court may not "reweigh the evidence or ... reconsider questions of fact anew." Downhole Pipe & Equip., L.P. v. United States , 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB , 975 F.2d 807, 815 (Fed. Cir. 1992) ).
DISCUSSION
I. Erdemir's Rule 56.2 Motion
A. Legal Framework for Date of Sale Determinations
To determine whether the subject merchandise is being sold at less than fair value, Commerce compares the export price or, as is the case here, the constructed export price[5] of the subject merchandise to its normal value.[6] See generally *1306 19 U.S.C. 1673 et seq. Normal value is "the price [of the foreign like product] at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." Id. § 1677b(a)(1)(A).
The antidumping statute does not state a particular methodology for determining the "time of sale" for purposes of that comparison. However, the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act defines "date of sale" for the purposes of currency conversion as the "date when the material terms of sale are established." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 810 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4153.[7] Consistent with the SAA, Commerce's regulations prescribe that "[i]n identifying the date of sale of the subject merchandise ..., the [agency] normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business." 19 C.F.R. § 351.401(i) (2015). The regulation further prescribes, however, that "the [agency] may use a date other than the date of invoice if [it] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." Id. ; see also Antidumping Duties; Countervailing Duties , 62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19, 1997) ("Preamble ") ("If [Commerce] is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, [Commerce] will use that alternative date as the date of sale").[8] In other words, Commerce's date of sale regulation establishes a "rebuttable presumption" in favor of the invoice date unless the proponent of a different date produces satisfactory evidence that the material terms of sale were established on that alternate date. Colakoglu Metalurji A.S. v. United States , 29 CIT 1238, 1240, 394 F.Supp.2d 1379, 1380-81 (2005) ; see also Toscelik Profil ve Sac Endustrisi A.S. v. United States , 41 CIT ----, ----, 256 F.Supp.3d 1260, 1263 (2017) ("Commerce's date of sale regulation ... squarely plac[es] the burden on interested parties challenging the presumptive invoice date[ ] to remove any doubt about when material terms are firmly and finally set ....") (citation omitted).
Material terms of sale may include price, quantity, and delivery and payment terms. See, e.g. , *1307 Sahaviriya Steel Industries Public Co. Ltd. v. United States , 34 CIT 709, 727, 714 F.Supp.2d 1263, 1280 (2010), aff'd , 649 F.3d 1371 (Fed. Cir. 2011) (citations omitted).[9] Commerce also has viewed the specification of an aggregate quantity tolerance level as a material term because of its potential to effect quantity. See Nakornthai Strip Mill Public Co. Ltd. v. United States , 32 CIT 553, 561, 558 F.Supp.2d 1319, 1327 (2008) ; Sahaviriya Steel , 34 CIT at 727, 714 F.Supp.2d at 1280. "[E]vidence that material terms of sale changed after the contract date is relevant to determining the date on which the parties had a real meeting of the minds." Nucor Corp. v. United States , 33 CIT 207, 264, 612 F.Supp.2d 1264, 1312 (2009) (internal quotation marks omitted). "In choosing a date of sale, Commerce weighs the evidence presented and determines the significance of any changes to the terms of sale involved." Sahaviriya Steel , 34 CIT at 728, 714 F.Supp.2d at 1263 ; see also Nakornthai III, 33 CIT at 336, 614 F.Supp.2d at 1333 (because Commerce typically disregards insignificant changes to material terms, the record supporting a finding that material terms were not set until invoicing must also "support the finding that [ ] change[s] to the material terms represented in the contract [were] significant").
B. Commerce's Reliance on the Invoice Date as the Date of Sale for Erdemir's Home Market Sales
1. Factual Background
For home market sales, Erdemir uses an online portal called "ErdemirOnline" to interact with its customers. See Sect. A Questionnaire Resp. of Eregli Demir ve Çelik Fabrikalari T.A.S. and Iskenderun Demir ve Çelik A.S ("Erdemir § A QR") at 19, CJA Tab 3, CR 25-58, PJA Tab 3, PR 107-113, ECF No. 69. Erdemir described the sales process as: (1) the customer places an order via email or fax stating certain requirements (including quantity, dimension, thickness, and quality); (2) Erdemir contacts the customer to review the order; (3) if the order is deemed suitable, Erdemir transmits to the customer a pro forma invoice via ErdemirOnline, email, or fax, stating the "order details, delivery details, price information and quotation with sale price and further information related to time of giving of order guarantee (option time)"; (4) the customer accepts the order via ErdemirOnline (the "click" date) within a given timeframe (referred to as "option time"). Erdemir § A QR, Ex. A-08 ("Domestic Terms & Conditions") ¶¶ 5.1-5.4; see also Erdemir § A QR, Ex. A-10 at 4 (screen shot of customer's acceptance through ErdemirOnline); Erdemir § A QR, Ex. A-10 at 5 (sample pro forma invoice for a home market sale).
When the order is ready to ship, the customer is notified through ErdemirOnline. Domestic Terms & Conditions ¶ 9.1. The actual quantity sold is subject to a leeway or tolerance based on the ordered quantity. Id. ¶ 9.4. The tolerances for homes market sales are: (1) +/-50 percent for orders less than 100 metric tons *1308 ("MT"); (2) +/-20 percent for orders 100-150MT; and (3) +/-10 percent for orders above 150MT. Id.[10] The unit price is stated (in USD/ton) on the pro forma invoice, deviations from which are not permitted. Id. ¶ 9.2. The final payable amount constitutes the unit price from the pro forma invoice, multiplied by the actual tonnage, plus value added tax. Id. ¶ 9.3. When making payment, the customer may elect to pay in cash or via credited (term) payment. Id. ¶ 9.4(a)-(b). If the customer selects a credited payment, it must make a pre-determined down payment before the payment deadline. Id. ¶ 9.4(b).
2. Parties' Contentions
Erdemir contends that Commerce erred in rejecting the "click date" as the date of sale. Erdemir Mem. at 17-20. Commerce reasoned that the payment term (cash or credited payment) is not fixed until the merchandise is ready to be picked up and the customer elects a cash or credited payment. See id. at 17-18. Erdemir contends that this election is included in the Domestic Terms & Conditions and, therefore, does not constitute a change. Id. at 18-20; see also Confidential Reply Br. in Supp. of Mot. of Pl. Eregli Demir ve Çelik Fabrikalari T.A.S., for J. Upon the Agency R. Pursuant to Rule 56.2 ("Erdemir Reply") at 1-4, ECF No, 65. Erdemir further contends that, to the extent the election of cash or credited payment is considered a "change" to a contract term, "the change is immaterial because Erdemir receives the same net value [from] the sale in either event." Erdemir Mem. at 19; Erdemir Reply at 2.[11]
The Government contends that Erdemir failed to produce sufficient evidence that the material terms of sale were established upon the "click date." Gov. Resp. at 36. The Government further contends that the flexibility afforded by Erdemir's Domestic Terms & Conditions do not overcome Commerce's regulatory presumption for the invoice date as the date of sale. Gov. Resp. at 36; see also id. at 37 ("Despite Erdemir's arguments, the fact remains that payment terms are a material term ....").
Defendant-Intervenors contend that Erdemir's argument regarding the immateriality of the customer's selection of cash or credited payment term "misunderstands [Commerce's] date of sale analysis." Def.-Ints. Resp. at 23. Pointing to Commerce's date of sale regulation, Defendant-Intervenors argue that "it is the date the material terms of sale relied on by [Commerce] are firmly and finally established that determines the date of sale, regardless of whether Erdemir views the specific terms as having any 'consequences.' " Id. at 24.
3. Analysis
In the underlying proceeding, Commerce pointed to Erdemir's fixing of the "total credit extension amount and per unit amount ... in the home market sales invoices" to support its determination that "differences in the material terms of sale between order and sales invoice [dates]" merited selection of the invoice date as the home market date of sale. I & D Mem. at 26 & nn.132-33 (internal quotations and footnote citations omitted). Commerce also pointed to its "normal practice" of considering *1309 delivery and payment terms as material terms of sale. I & D Mem. at 26. Commerce's conclusory analysis fails to demonstrate a reasoned decision supported by substantial evidence.
The payment terms provided in Erdemir's Domestic Terms & Conditions expressly permit Erdemir's customers to pay by cash or credited payment when the goods are ready to ship. See Domestic Terms & Conditions ¶ 9.4. The payment term does not change in that the option to pay by cash or credited payment is withdrawn or otherwise modified; instead, Erdemir's customers exercise that option at the appropriate time. See id. ; Erdemir Mem. at 18 (Commerce failed to consider evidence that the payment option "is embedded in the contract itself"); Erdemir Reply at 1 ("Commerce fails to identify any payment term that ever changed ...."). Commerce does not explain why the selection of the payment option at the so-called "ready date," when the cash or credit terms have been pre-established and are alleged to be economically equivalent,[12] represents a change to a material term. See I & D Mem. at 26. Cf. Nakornthai III , 33 CIT at 334-36, 614 F.Supp.2d at 1332-33 (rejecting Commerce's assertion that the elimination of a line item tolerance level materially alters the contract merely because tolerance is considered material because it fails to address the significance of the change).[13]
The Government's attempt to distinguish Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States , 33 CIT 695, 735-36, 625 F.Supp.2d 1339, 1372-73 (2009) is unpersuasive. Gov. Resp. at 38; see also Erdemir Mem. at 19-20 (analogizing Habas ). In Habas , following a remand, Commerce reversed its prior determination and relied on the contract date as the date of sale despite a post-contract billing adjustment because the adjustment was a late delivery fee to which parties had contractually agreed. 33 CIT at 735-36, 625 F.Supp.2d at 1373. The Government asserts that Habas is distinguishable because the record in that case reflected a billing adjustment to one sale, whereas here, credit terms for several sales were *1310 finalized at the time of invoicing. Gov. Resp. at 38 (citation omitted). Habas , however, did not rely on the number of sales to which the billing adjustment applied; rather, the court sustained Commerce's determination because the contractual nature of the late delivery fee meant that material terms of sale had not changed. 33 CIT at 735-76, 625 F.Supp.2d at 1373. Additionally, to the extent the Government seeks to rely on the number of sales for which credit terms were selected at the "ready date," the Issues and Decision Memorandum lacks any such analysis or reliance. See I & D Mem. at 26; Burlington Truck Lines, Inc. v. United States , 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (the court may not accept "post hoc rationalizations for agency action," and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself").
Defendant-Intervenors' reliance on the Preamble to Commerce's date of sale regulation is also unavailing. Defendant-Intervenors quote a passage stating that certain terms may remain negotiable even after the initial agreement between buyer and seller. Def.-Ints. Resp. at 23-24 (quoting Preamble , 62 Fed. Reg. at 27,348-49). Here, however, there is no evidence that terms remained negotiable, or that Erdemir's customers changed their minds and were accommodated by Erdemir. Cf. SeAH Steel Corp., Ltd. v. United States , 25 CIT 133, 136 & n.7, 2001 WL 180259 (2001) (sustaining Commerce's reliance on the invoice date when the record demonstrated that SeAH permitted a customer to request a different payment term between the contract date and invoice date). Accordingly, the court will remand Commerce's date of sale determination for Erdemir's home market sales for reconsideration or further explanation.
C. Commerce's Reliance on the Invoice Date as the Date of Sale for Erdemir's U.S. Sales
1. Factual Background
For sales to the United States, customers initiate the sales process through a written or oral inquiry, to which Erdemir responds with a written offer. Erdemir § A QR at 19. Erdemir subsequently issues a more detailed sales agreement, pro forma invoice, and technical data sheet specifying price, grade, size, shipping conditions, and quantity, which is then signed by both parties. Id. The general terms and conditions for U.S. sales accompanying the sales agreement state that it "shall come into force when signed by both parties ...." Erdemir § A QR, Ex. A-09 (sample U.S. sales agreement) ("U.S. Terms & Conditions") ¶ 6.1. The pro forma invoice more specifically states that, "[u]pon receipt of the Pro-forma Invoice signed by the Buyer, it is at the ultimate discretion of the Seller to give final confirmation to the Pro-forma Invoice by the signing the same." Erdemir § A QR, Ex. A-9 (pro forma invoice) ("Pro Forma") Misc. ¶ 1. Thereafter, Erdemir's customer issues a letter of credit. Erdemir § A QR at 19. If the letter of credit is untimely, Erdemir has the option to accept or reject the letter of credit; extending the letter of credit opening term is at Erdemir's sole discretion. U.S. Terms & Conditions, Annex 3 ¶ 2.2. U.S. sales are subject to quantity tolerances in the following amounts: (1) +/-10 percent for line items over 200MT; (2) +/-10 percent for each lot; and (3) +/-10 percent for each sale (grand total). Erdemir § A QR, Ex. A-9 (technical specifications) ("Tech. Specs.") ¶ 3.2. For sizes/items equal to or less than 200MT, the tolerance may exceed +/-10 percent. Id.
2. Parties' Contentions
Erdemir contends that Commerce erred in rejecting the date upon which it signed the pro forma invoice as the date of sale on *1311 the basis of volume differences, multiple signature dates, and delays in opening letters of credit because (1) any differences between the quantities ordered and shipped were immaterial;[14] (2) in accordance with the U.S. Terms & Conditions and the pro forma invoice, "the only relevant [signature] date is the last date-that of Erdemir's signature"; and (3) the U.S. Terms & Conditions permit Erdemir to determine the consequences of an untimely letter of credit, which includes extending the opening term. Erdemir Mem. at 21-26; Erdemir Reply at 5-12.[15]
The Government contends that "Erdemir's relatively small number of U.S. sales" in conjunction with inconsistencies between the quantities ordered and shipped favored selecting the invoice date. Gov. Resp. at 41. The Government further contends that Commerce reasonably determined that the presence of "multiple document dates on the pro forma invoice" meant "that either the material terms changed at the last minute, or were not yet finalized when the document was signed." Gov. Resp. at 41-42 ("Commerce made a reasonable assumption that the printed date on the pro forma invoice was crossed out because the material terms changed at the last minute, or were not yet finalized when the document was signed."). The Government also contends that the failure to timely open the letter of credit "supported the finding that the payment terms set forth in the pro forma invoices not only have the potential to change, but do change." Gov. Resp. at 39-40; see also Def.-Ints. Resp. at 18-19, 21-23 (advancing similar arguments).[16]
3. Analysis
Commerce articulated three reasons for rejecting the pro forma signature date as the date of sale. As discussed below, the court sustains Commerce's determination on the basis of each of these reasons.
a. Volume Differences
Commerce asserted that for "small shipments, U.S. customers are bound to accept the quantity shipped regardless of the quantity they ordered," and the record showed differences between the quantities ordered and shipped. I & D Mem. at 26. Commerce further explained that "some of Erdemir's larger U.S. sales failed to meet the tolerance *1312 threshold set forth in the terms of sale." Id. at 26 & n.136 (citation omitted). Commerce noted that, in Circular Welded Pipe from Taiwan , differences in the material terms of just 2 out of 62 sales merited basing the date of sale on the invoice date. Id. at 26-27 (citing Circular Welded Carbon Steel Pipes and Tubes from Taiwan , 76 Fed. Reg. 63,902 (Dep't Commerce Oct. 14, 2011) (final results of antidumping duty admin. review) ("Circular Welded Pipe from Taiwan "), and accompanying Issues and Decision Mem., A-583-008 (Oct. 6, 2011) at Cmt. 1). Commerce explained that, by that standard, there were sufficient changes here such that Erdemir failed to establish a date of sale other than invoice date. Id. at 27.
Commerce's reliance on quantity differences for small shipments is unsupported by record evidence. First, Commerce's reference to "small shipments" is unclear. The absence of a tolerance applies only to line items below 200MT. See Tech. Specs. ¶ 3.2. None of Erdemir's sales were this small. See Suppl. § B-C Questionnaire Resp. of Eregli Demir ve Çelik Fabrikalari T.A.S. and Iskenderun Demir ve Çelik A.S ("Erdemir 2nd Suppl. § BC QR"), Ex. SBC-21, CJA Tab 11, CR 193-246, PJA Tab 11, PR 214, ECF No. 69 (Erdemir Invoice/Contract Sales Comparison). Moreover, the tolerances applicable to lot and grand totals mean that Erdemir's customers are not "bound to accept the quantity shipped regardless of the quantity they ordered," see I & D Mem. at 26, because these aggregate tolerances would still be applicable.
Commerce's reliance on volume differences and Erdemir's purported failure to meet the tolerance thresholds for "larger U.S. sales" supports Commerce's date of sale decision. While each lot and sale conformed to leeway allowances, two line items in one lot of one sale exceeded the 10 percent tolerance limit for line items above 200MT. See Erdemir 2nd Suppl. § BC QR, Ex. SBC-21. Circular Welded Pipe from Taiwan is, thus, analogous to this case because the record evidences Erdemir's ability to ship items not in conformity with the quantity ordered or the tolerance limits established in the signed pro forma invoice. See I & D Mem. at 26. This evidence supports Commerce's finding that Erdemir failed to establish that the material terms of sale were set on a date other than invoice date.
b. Letter of Credit Opening Dates
Erdemir's U.S. Terms & Conditions require letters of credit to be opened within a particular timeframe. U.S. Terms & Conditions, Annex 3 ¶ 2.1. According to Commerce, the failure of several customers to timely open the letters of credit means that payment terms are not final when the pro forma invoice is signed. I & D Mem. at 27 & n.142 (citing Welded Line Pipe from the Republic of Turkey , 80 Fed. Reg. 61,362 (Dep't Commerce Oct. 13, 2015) (final determination of sales at less than fair value), and accompanying Issues and Decision Mem., A-489-822 (Oct. 5, 2015) (" Welded Line Pipe from Turkey , I & D Mem.") at Cmt. 9).[17]
In Welded Line Pipe from Turkey , Commerce declined to rely on the contract date as the date of sale when the customer's failure to timely establish a letter of credit required amending the contract to "change the letter of credit expiry date *1313 and latest date of shipment." Welded Line Pipe from Turkey , I & D Mem. at 24. Here, while Erdemir's U.S. Terms & Conditions allow Erdemir to accept or reject untimely letters of credit, see U.S. Terms & Conditions, Annex 3 ¶ 2.2, the frequency with which customers were untimely in opening the letters of credit and with which Erdemir waived the deadline supports Commerce's decision that Erdemir did not adequately demonstrate that material terms were set on a date other than invoice date, see Erdemir Final Analysis Mem. at 3.
c. Pro Forma Signature Dates
Commerce also identified a pro forma invoice with different signature dates, which prevented it "from determining which date should be considered the signature date for those sales." I & D Mem. at 27;[18] see also Erdemir Final Analysis Mem. at 3 & n.3.[19] Substantial evidence supports Commerce's determination. Specifically, Erdemir signed the pro forma invoice associated with SVE 11 on two different signature dates: November 12, 2014 and November 17, 2014. See SVE 11. The pro forma invoice states that Erdemir's signature "give[s] final confirmation" for the sale. Pro Forma, Misc. ¶ 1. It is, therefore, unclear whether the pro forma invoice associated with SVE 11 became "final" on November 12 or November 17. While Erdemir asserts that its "final signature binds the parties," this is not the only reasonable interpretation of the evidence. See Matsushita , 750 F.2d at 933 (the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence).[20] The lack of clarity regarding when the pro forma invoice associated with SVE 11 became final provides substantial evidence supporting Commerce's rejection of Erdemir's signature date as the date of sale.[21] Commerce's three reasons for its determination *1314 to reject Erdemir's proposed date of sale for U.S. sales are each supported by substantial evidence.
II. Çolakoglu's Rule 56.2 Motion
A. Commerce's Denial of Çolakoglu's Duty Drawback Adjustment
1. Legal Framework
Pursuant to 19 U.S.C. § 1677a(c)(1)(B), Commerce will increase constructed export price ("CEP") by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." This statutory duty drawback adjustment is intended to prevent the dumping margin from being distorted by import taxes that are imposed on raw materials used to produce exported subject merchandise. See Wheatland Tube Co. v. United States , 30 CIT 42, 60, 414 F.Supp.2d 1271, 1286 (2006), rev'd on other grounds , 495 F.3d 1355 (Fed. Cir. 2007) ; Allied Tube & Conduit Corp. v. United States , 29 CIT 502, 506, 374 F.Supp.2d 1257, 1261 (2005) (citations omitted).
Commerce has developed a two-prong test to determine whether a respondent is entitled to a duty drawback adjustment. First, the import duty and rebate or exemption must be "directly linked to, and dependent upon, one another"; and, second, the respondent "must demonstrate that there were sufficient imports of the imported material to account for the duty drawback or exemption granted for the export of the manufactured product." I & D Mem. at 5; see also Saha Thai Steel Pipe (Public) Co. Ltd. v. United States , 635 F.3d 1335, 1340-41 (Fed. Cir. 2011) (affirming the lawfulness of Commerce's two-prong test).
"[T]he first prong enables Commerce to verify that the home country allows rebates or exemptions only for those imported inputs used to produce exported merchandise," Wheatland Tube , 30 CIT at 60, 414 F.Supp.2d at 1286. The second prong "requires the foreign producer to demonstrate that it has imported a sufficient amount of raw materials to account for the drawback received upon export of the finished product." Id. (citation omitted). The respondent bears the burden of proving its eligibility for the duty drawback adjustment. See, e.g. , Allied Tube , 29 CIT at 506-07, 374 F.Supp.2d at 1261.
2. Procedural Background
Çolakoglu first responded to Commerce's questions regarding duty drawback in its initial questionnaire response filed on December 9, 2015. See Questionnaire Resp. of Çolakoglu Metalurgi, A. S, and its Affiliates to Sect. C of the U.S. Dep't of Commerce Antidumping Duty Questionnaire ("Çolakoglu § C QR") at C-32-C-34, CJA Tab 6, CR 125-26, PJA Tab 6, PR 158-60, ECF No. 69. On January 21, 2016, Commerce issued a third supplemental questionnaire, and for the first time, asked for additional information about Çolakoglu's duty drawback calculation. See Third Suppl. Questionnaire ("Çolakoglu Third Suppl. § BC Questionnaire") at 6, CJA Tab 8, CR 162, PJA Tab 8, PR 190, ECF No. 69.[22] Çolakoglu responded to *1315 Commerce's supplemental questionnaire attaching, inter alia , three exhibits supporting its duty drawback request. See Part II of Questionnaire Resp. of Çolakoglu Metalurgi, A.S, and its Affiliates to Third Suppl. Sects. B and C of the U.S. Dep't of Commerce Antidumping Duty Questionnaire ("Çolakoglu Third Suppl. § BC QR Part II"), Ex. SBC-13a (copies of IPRs), CJA Tab 15, CR 275-79, PJA Tab 15, PR 223-25, ECF No. 69; id. , Ex. SBC-13c (revised duty drawback calculation); id. , Ex. SBC-13d (a copy of an extract obtained from the Turkish Ministry of Economy online system covering U.S. sales).
Commerce preliminarily determined not to grant Çolakoglu a duty drawback adjustment on the basis that certain documents were illegible or insufficiently translated, and "failed to establish a link between the imported inputs and the duties exempted upon export because there was no evidence that the inputs subject to the IPR were used in exported subject merchandise." Prelim. Mem. at 13 & n.58 (explaining that "Çolakoglu's documents could not be tied to an official Turkish government source"). Commerce, therefore, concluded that Çolakoglu had failed to satisfy the first of its two-prong test. Id. at 13.
Çolakoglu "offer[ed] to provide better quality copies of certain documents" on the first day of verification, Çolakoglu Protest Regarding Dep't Refusal to Verify Duty Drawback (April 4, 2016) ("Çolakoglu April 4 Protest") at 1-2, CJA Tab 25, PJA Tab 25, PR 267, ECF No. 69-1, but Commerce declined the documents and refused to verify Çolakoglu's request for the duty drawback adjustment, I & D Mem. at 7. Çolakoglu protested Commerce's refusal. See, e.g. , Çolakoglu April 4 Protest.
3. Parties' Contentions
Çolakoglu contends (1) that substantial evidence demonstrates that it has met both requirements of Commerce's two-prong test; (2) Commerce should have informed it that certain submissions related to its duty drawback request were deficient and provided an opportunity to remedy or explain the deficiency; and (3) Commerce should nonetheless have verified the adjustment. Çolakoglu Mem. at 12-23; Confidential Reply Br. of Consolidated-Pls. Çolakoglu Metalurji A.S. and Çolakoglu Dis Ticaret A.S. ("Çolakoglu Reply") at 2-12, ECF No. 64.
The Government contends that Commerce correctly declined the adjustment because Çolakoglu failed to show "that its inputs ... were used to manufacture exported subject merchandise," and the incomplete translations and illegibility of certain record documents meant that "Commerce could not ascertain if the slabs imported by Commerce were indeed the types of slab necessary to produce hot-rolled steel." Gov. Resp. at 12-13. The Government further contends that Commerce gave Çolakoglu several opportunities to submit documents demonstrating its entitlement to the adjustment, Çolakoglu "knew or should have known that it submitted [deficient documents]," and Commerce's statutory responsibility to inform respondents of deficient submissions must be read in light of the respondent's burden to "provide Commerce with an accurate submission within the prescribed statutory deadline." Id. at 16-18. The Government also contends that Commerce correctly declined to verify the adjustment *1316 because the information Çolakoglu provided was "not capable of verification." Id. at 19.
Defendant-Intervenors contend that Commerce correctly determined that Çolakoglu was not entitled to the duty drawback adjustment, and Commerce "was not required to direct Çolakoglu to submit documentation establishing the authenticity of the information it submitted on the record." Def.-Ints. Resp. at 29. Defendant-Intervenors further contend that the submitted documents, even if accepted, did not establish the necessary link, and Commerce correctly declined to verify the adjustment. Id. at 30, 31-34.
4. Analysis
Çolakoglu contends that substantial evidence supports granting the duty drawback adjustment. See Çolakoglu Mem. at 12-18. The relevant inquiry for the court's review however, is whether Commerce's decision to deny the adjustment is supported by substantial evidence. See 19 U.S.C. § 1516a(b)(1)(B)(i). Commerce's decision rests on its determination that Çolakoglu failed to meet the first prong of the agency's two-prong test. See I & D Mem. at 5 ("Çolakoglu ... fail[ed] to establish a link between the imported inputs and the duties exempted upon export ...."). However, Commerce has failed to articulate a clear standard by which it determines whether that link has been met, and Commerce's reasons for finding that Çolakoglu failed to meet the test are unsupported by substantial evidence.
As to the first prong, Commerce explained that it seeks only "a reasonable link between the duties imposed and those rebated or exempted"; it does "not require that the imported material be traced directly from importation through exportation." Id. at 4. Commerce goes on, however, to present different measures for substantiating its "reasonable link," somewhat interchangeably, without addressing the distinct evidentiary burdens of each. Specifically, Commerce stated that Çolakoglu failed to demonstrate (1) that "the inputs [slab] subject to the IPR were used to manufacture the exported subject merchandise," (2) "that the particular export was made with the slab imported under the same IPR," (3) whether the "slabs ... were indeed the types of slabs necessary for the production of hot-rolled steel," or (4) that "the imported slab can be used and was used to make the final product." Id. at 5-6 (emphasis added). Commerce further stated that "[i]n prior Turkish cases, [it] has required that there be evidence on the record that the imported inputs can be used in the production of the final product." Id. at 5 & n.16 (citing Certain Oil Country Tubular Goods From the Republic of Turkey , 79 Fed. Reg. 41,971 (Dep't Commerce July 18, 2014) (final determination of sales at less than fair value and aff. final determination of critical circumstances, in part), and accompanying Issues and Decision Mem., A-489-816 (July 10, 2014) ("OCTG from Turkey , I & D Mem.") at Cmt. 1); Steel Concrete Reinforcing Bar From Turkey , 79 Fed. Reg. 54,965 (Dep't Commerce Sept. 15, 2014) (final neg. determination of sales at less than fair value and final determination of critical circumstances), and accompanying Issues and Decision Mem., A-489-818 (Sept. 8, 2014) at Cmt. 1); cf. Gov. Resp. at 13-14 (asserting that Çolakoglu failed to show that the imported slabs and exported hot-rolled steel shared "certain metallurgical characteristics, such as carbon content").
There is a difference between demonstrating that specific imports of slab were used to produce specific exports of hot-rolled steel, and demonstrating that the slab imported under the Turkish IPR is suitable for producing hot-rolled steel. Commerce's citation to prior Turkish cases fails to clarify the applicable standard. In *1317 OCTG from Turkey , for example, the agency granted the adjustment when "[e]ach respondent demonstrated that when it opened the DIIBs,[23 ] it documented 1) projected quantities of imports, which qualify based on an 8-digit level HTS ["Harmonized Tariff Schedule"] number (which include API-5CT coil used for OCTG) ...." OCTG from Turkey , I & D Mem. at Cmt. 1; I & D Mem. at 5 n.16. Commerce further justified the adjustment on the basis that "each respondent ha[d] demonstrated that the Turkish Government approved and maintained DIIBs through the IPR which documented exports of OCTG to the United States." OCTG from Turkey , I & D Mem. at Cmt. 1 (emphasis added). So too here, Çolakoglu provided information for each IPR documenting what appear to be HTS codes (referred to as "GTIP" codes) for the imported slab and corresponding exports. See, e.g. , Çolakoglu Third Suppl. § BC QR Part II, Ex. SBC-13a (IPR 2923, p.6). Çolakoglu also demonstrated the Turkish Government's approval of each IPR on the basis that the duty free imports were used to produce the exported material. See, e.g. , id. (IPR 2923, p.1). Commerce's explanation and conclusory citations to prior rulings fail to apprise the court of the precise standard it seeks to apply in this case, and whether that standard is consistent with-or departs from-its prior rulings. See RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002) ("[A]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (citation omitted).
At oral argument, the Government explained that obtaining the adjustment requires more than demonstrating eligibility for the duty drawback pursuant to Turkish law, but less than a direct tracing of an input from import to export. The Government further stated that Çolakoglu's documentation failed to apprise Commerce of certain metallurgical characteristics or otherwise indicate that the imported slabs were the types of slabs used to produce hot-rolled steel.[24] Oral Arg. at 1:20:15-1:28:15.[25] The Government's oral presentation suggests that Commerce's references to the actual use of imported slab in exported hot-rolled steel were mistaken and should be understood as speaking to the suitability of the imported slab. The court may not accept "post hoc rationalizations for agency action," and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself." Burlington Truck Lines, 371 U.S. at 168-69, 83 S.Ct. 239. Commerce's rationale is unclear and insufficiently moored to past practice. For that reason alone, a remand is required for Commerce to clarify its standard for determining eligibility for the duty drawback adjustment. However, Commerce's stated reasons for failing to find the first prong satisfied also lack merit.
Commerce first points to partial translations and the illegibility of certain documents on the record. I & D Mem. at 5. Commerce explained that it was not required *1318 to issue a supplemental questionnaire because Çolakoglu bore the burden of demonstrating eligibility for the adjustment, and it had "ample opportunity" to do so. I & D Mem. at 6-7.[26] It is true that respondents bear the burden of demonstrating eligibility for a duty drawback adjustment, see Allied Tube , 29 CIT at 506-07, 374 F.Supp.2d at 1261, and submitting accurate information, see 19 U.S.C. § 1677m(b). If, however, Commerce
determines that a response to a request for information under this subtitle does not comply with the request, [Commerce] shall promptly inform the person submitting the response of the nature of the deficiency and shall , to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews.
19 U.S.C. § 1677m(d) (emphasis added). Commerce did not address the requirements of § 1677m(d). See I & D Mem. at 6-7. Commerce's assertion that Çolakoglu had several opportunities to submit factual information demonstrating eligibility for the adjustment appears to overlook the procedural record of this case. Çolakoglu provided information regarding duty drawback in its initial questionnaire response, and it was not until Commerce issued a third supplemental questionnaire to Çolakoglu that it sought any additional information regarding duty drawback. See Çolakoglu § C QR at C-32-C-34; Çolakoglu Third Suppl. § BC Questionnaire at 6. The Government's suggestion that Commerce's statutory obligation is mitigated by the respondent's burden to provide accurate information runs counter to the mandatory nature of § 1677m(d). See Gov. Resp. at 16.[27] Commerce erred in failing to inform Çolakoglu that its supplemental submission was deficient or make findings with regard to the practicability of providing Çolakoglu with an opportunity to remedy or explain the deficiencies.[28]
*1319 Commerce also points to the lack of an official Turkish government seal, stamp, or identifying marker on documents "showing the amount of imported slab and exported finished hot-rolled steel." I & D Mem. at 5. Commerce did not cite any request or past practice requiring an official seal on a document appended to a questionnaire response, or otherwise explain why it declined to inform Çolakoglu of the deficiency pursuant to 19 U.S.C. § 1677m(d) or otherwise confirm the documents' authenticity at verification. See I & D Mem. at 5.[29] This particular basis is entirely conclusory and, thus, lacking in reasoned explanation.
Commerce further points to discrepancies in the quantities and values of the imported material and the exported product in the legible and translated portions of the IPR closing documents in Exhibit SBC-13a as compared to Çolakoglu's duty drawback calculation worksheet contained in Exhibit SBC-13c. I & D Mem. at 5-6 & nn.17-18 (citing Çolakoglu 3rd Suppl. § BC QR Part II, Exs. SBC-13a and SBC-13c). There are slight discrepancies in the value of the imported inputs for two of the IPRs, compare Çolakoglu 3rd Suppl. § BC QR Part II, Ex. SBC-13a (IPR 484, p.1 and IPR 4246, p.1), with id. , Ex. SBC-13c (total purchases for each IPR),[30] and discrepancies in the quantity of imports and exports for each IPR.[31] Nowhere, however, does Commerce explain the materiality of these discrepancies for the purpose of demonstrating whether the imports can (or were) used to produce the subject merchandise. See I & D Mem. at 5-6. At oral argument, the Government and Defendant-Intervenors both suggested that each basis for Commerce's determination should not be viewed in isolation, but as one of several factors that, together, merited Commerce's decision to deny the adjustment. See Oral Arg. at 1:48:05-1:49:51, 1:49:58-1:50:08. Such an approach, however, obfuscates the weakness of each basis that, individually and together, fail to support Commerce's determination.
Finally, Commerce refused to verify Çolakoglu's duty drawback request because Çolakoglu's original submission was "too deficient to rely upon and thus not capable of verification." I & D Mem. at 7.[32] As discussed above, however, Commerce's refusal *1320 to verify the adjustment is predicated on faulty reasoning and a failure to adhere to its statutory obligation concerning deficient submissions. The agency's assertion that the record information was "too deficient" for verification is unsupported by substantial evidence because Commerce failed to inform Çolakoglu of the deficiency or make findings with regard to the practicability of providing Çolakoglu with an opportunity to remedy or otherwise address the deficiencies. See 19 U.S.C. § 1677m(d).
Commerce claimed that accepting Çolakoglu's documents at verification would have constituted "the acceptance of a new questionnaire response ... in a time period [Çolakoglu] established" rather than the agency's deadlines, which would have "precluded the [agency] from analyzing the information thoroughly and ... denied other parties ... the opportunity to comment meaningfully." I & D Mem. at 7. However, "[r]emedying any deficiency in a questionnaire response typically will require submission of new information." China Kingdom Import & Export Co., Ltd. v. United States , 31 CIT 1329, 1350, 507 F.Supp.2d 1337, 1356 (2007). Further, Çolakoglu attempted to submit the documents in response to Commerce's initial identification of its inability to read certain exhibits, and not at some arbitrary time Çolakoglu unilaterally established. See Prelim. Mem. at 13 (dated March 14, 2016); Çolakoglu April 4 Protest at 1-2; cf. China Kingdom , 31 CIT at 1350, 507 F.Supp.2d at 1356-57 ("A mere finding that the remedy would require Commerce to consider new information [presented at verification] is not commensurate with a finding that allowing the interested party to effect the remedy would be impracticable under the circumstances, given the statutory time limits.").
In sum, Commerce's decision to deny Çolakoglu's request for a duty drawback adjustment was based on its procedural missteps and inconsistent and conclusory analysis that, as a whole, renders its determination lacking substantial evidence and reasoned explanation. Accordingly, it will be remanded for reconsideration.
B. Commerce's Denial of a Quarterly Cost-Averaging Methodology
1. Legal Framework
Commerce calculates the normal value of the subject merchandise on the basis of home market sales that are made "in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce, therefore, disregards sales at prices that are less than the cost of production, id. § 1677b(b)(1), because those sales are not made within the ordinary course of trade, id. § 1677(15)(A). The cost of production "equal[s] of the sum of ... the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business." Id. § 1677b(b)(3)(A) (emphasis added).[33]
*1321 The statute does not define the "period" to be used or the method by which Commerce must calculate the costs of production. SeAH Steel Corp. v. United States , 34 CIT 605, 614, 704 F.Supp.2d 1353, 1361 (2010). Commerce's usual methodology is to rely on "an annual weight-average cost" for the period of investigation. I & D Mem. at 13. Commerce may depart from its usual methodology and rely on quarterly cost-averages when "significant cost changes are evident [and] ... sales can be accurately linked with the concurrent quarterly costs." Pastificio Lucio Garofalo, S.p.A. v. United States , 783 F.Supp.2d 1230, 1235-36 (CIT 2011), aff'd 469 Fed.Appx. 901 (Fed. Cir. 2012) ; see also I & D Mem. at 13-14. The significance of any cost changes must be demonstrated before Commerce analyzes the linkage between costs and sales. I & D Mem. at 13. A significant cost change "is defined as a greater than 25 percent change in [cost of manufacturing] between the high and low quarters during the POI ...." Id. at 14.[34]
2. Parties' Contentions
Çolakoglu contends that Commerce's 25 percent threshold for relying on quarterly cost-averages is "overly rigid" and fails to capture significant cost changes arising through currency fluctuations. Çolakoglu Mem. at 26. According to Çolakoglu, Commerce should have conducted its analysis in U.S. Dollars instead of Turkish Lira-thereby accounting for "devaluations of the Turkish Lira in relation to the U.S. [Dollar]"-because it purchased "[a]lmost all major inputs" in U.S. Dollars before converting the costs to Lira in its accounting system. Çolakoglu Mem. at 27, 31-32; see also Çolakoglu Reply at 18 ("[R]egardless of the currency in which Çolakoglu keeps its books, the costs of its material input purchases are incurred in USD."). Had Commerce done so, "the 25 percent threshold test would have been met and would have triggered the use of Commerce's alternative cost methodology." Çolakoglu Mem. at 26, 32.
The Government contends that Commerce correctly applied its usual methodology by conducting its cost change analysis in Turkish Lira because that is the currency in which Çolakoglu maintains its books and records. Gov. Resp. at 27. The Government further contends that Çolakoglu's argument that Commerce "should have converted [its] normal accounting records, which are stated in Turkish Lira, to U.S. [D]ollars, because it purchased inputs in dollars, ... is just selective accounting for Çolakoglu's desired outcome." Gov. Resp. at 26.
Defendant-Intervenors contend that Çolakoglu has "misconstrue[d] the standard of review." Def.-Ints. Resp. at 39 ("The [c]ourt must decide whether the administrative record contains substantial evidence to support [Commerce's] decision.") (internal quotation marks, alteration, emphasis, and citation omitted).
3. Analysis
Çolakoglu essentially argues that Commerce's methodology for determining when to deviate from annual cost-averages and rely on quarterly cost-averages is unreasonable because it fails to account for currency fluctuations. See Çolakoglu Mem. at 31 ("The 25 [percent] threshold is not *1322 statutory, and would be improved by incorporating an exchange rate factor."). Yet, as Çolakoglu concedes, Commerce has broad discretion to develop a suitable methodology for calculating the costs of production. See Çolakoglu Mem. at 28 (quoting SeAH Steel , 34 CIT at 617, 704 F.Supp.2d at 1363 ("Commerce is afforded considerable discretion in formulating its practices in this regard.") ). Beyond asserting that the 25 percent threshold is "overly rigid" and identifying an alternative (preferred) outcome had Commerce conducted its analysis in U.S. Dollars, Çolakoglu offers no persuasive reason why Commerce's methodology is unreasonable on its face or as applied in this case. Commerce rejected Çolakoglu's request to convert its accounting records from Turkish Lira to U.S. Dollars before conducting its analysis because "[t]he analysis of significant cost change should be performed in the same currency as contained in the cost database, which is Turkish Lira." I & D Mem. at 15. Commerce further explained that "Çolakoglu's reported costs already take into account exchange rate differences because purchases in U.S. dollars are converted to Turkish Lira in the month of the purchase in the normal course of business." Id. at 15. Commerce's refusal was reasonable and consistent with the statute that provides for cost calculations on the basis of the exporter's books and records. See 19 U.S.C. § 1677b(f)(1)(A).
Çolakoglu also fails to explain why conducting the analysis in U.S. Dollars would not distort Commerce's calculations. Although "[a]lmost all major inputs" are purchased in U.S. Dollars, some inputs are purchased in Turkish Lira. See Çolakoglu Mem. at 27; Çolakoglu's Request for Applying Quarterly Average Cost Data at 3, CJA Tab 17, CR 304, PJA Tab 17, PR 244, ECF No. 69-1. Additionally, the cost of production consists of "the cost of materials and of fabrication or other processing," among other things. 19 U.S.C. § 1677b(b)(3) (emphasis added). Although Çolakoglu's raw material costs account for more than 60 percent of the cost of producing hot-rolled steel, Çolakoglu's Case Br. (Rev.) at 22, CJA Tab 34, CR 473-45, PJA Tab 34, PR 312-16, ECF No. 69-2, expenses for the remaining aspects of production (e.g., energy, labor, etc.) are, presumably, incurred in Turkish Lira. These facts further support Commerce's determination to conduct its analysis in the currency in which Çolakoglu keeps it books. Commerce's finding that Çolakoglu's cost changes did not exceed the 25 percent threshold is supported by substantial evidence[35] and will be sustained.
C. Commerce's Treatment of Excess Heat as a Co-Product Instead of a By-Product
1. Legal Framework
"The antidumping statute does not mention the treatment of by-products, and Commerce has not filled the statutory gap with a regulation." Arch Chemicals, Inc. v. United States , Slip Op. 11-41, 2011 WL 1449034, at *2 (CIT Apr. 15, 2011) (internal quotation marks and citation omitted). However, Commerce's "practice has been to grant an offset to normal value, for sales of by-products generated during the production of subject merchandise, if the respondent can demonstrate *1323 that the by-product is either resold or has commercial value and re-enters the respondent's production process." Id. (emphasis omitted).[36] Commerce considers several factors to determine whether joint products[37] are co-products or by-products:
1) how the company records and allocates costs in the ordinary course of business, in accordance with its home country [generally accepted accounting principles ("GAAP") ]; 2) the significance of each product relative to the other joint products; 3) whether the product is an unavoidable consequence of producing another product; 4) whether management intentionally controls production of the product; and, 5) whether the product requires significant further processing after the split-off point.
I & D Mem. at 17 (citations omitted).
No one factor is dispositive, and Commerce "consider[s] each factor in light of all of the facts and circumstances surrounding each case." I & D Mem. at 17. Çolakoglu bears the burden of substantiating its entitlement to a by-product offset. See 19 C.F.R. § 351.401(b)(1).
2. Parties' Contentions
Çolakoglu contends that Commerce erroneously found that Çolakoglu "tracks the production of excess heat and assigns a cost to it." Çolakoglu Mem. at 34; Çolakoglu Reply at 19 ("Commerce's factual premise for its conclusion is simply wrong."). Çolakoglu further contends that its recordation of revenue from the sale of excess heat is consistent with Turkish GAAP, and Commerce's conclusion that the separate recording of revenue supports treatment of the excess heat as a co-product calls into question the relevance of Commerce's joint product distinction to Turkish GAAP. Çolakoglu Mem. at 34-35. The Government contends that a respondent's recording of costs "is just one factor in Commerce's well-established analysis of whether [a joint product] is a co-product or a by-product," and Commerce's decision is consistent with prior proceedings involving Çolakoglu. Gov. Resp. at 30-31 (citation omitted); see also Def.-Ints. Resp. at 39-40.
*1324 3. Analysis
Çolakoglu operates a gas turbine ("GT1"), which generates power for its steel production as well as electricity and excess heat. I & D Mem. at 16. Çolakoglu's affiliate, Ova Elektrik, A.S. ("OVA"), owns a steam turbine. Id. Çolakoglu sells the excess heat generated by GT1 to OVA for use in its steam turbine. I & D Mem. at 16; see also Verification of the Cost Resp. of Çolakoglu Metalurgi A.S. and its Affiliates at 22, Çolakoglu Suppl. CJA Tab 4, CR 464, Çolakoglu Suppl. PJA Tab 4, PR 293, ECF No. 82 (describing the process by which excess heat is sold to OVA). Çolakoglu reported the "revenues generated from the sale of excess heat to its affiliate OVA as a by-product offset to the electricity costs used in its steel production." I & D Mem. at 16 (citations omitted). Commerce, however, disagreed, finding that Çolakoglu's excess heat should instead be treated as a co-product, thereby disallowing a "full revenue offset to Çolakoglu's production of electricity." Id. at 16.
Commerce's determination rested on the first and second of the above-listed factors. See id. at 17-18.[38] As to the first factor, Commerce found that Çolakoglu tracks the production of excess heat, assigns a cost to it, and "records sales of excess heat as a main income." I & D Mem. at 17. However, Commerce did not identify record evidence to support its finding that Çolakoglu assigns a cost to excess heat. See id. Although Çolakoglu records the cost of electricity sold to OVA, it does not appear to assign a cost for excess heat. See Questionnaire Resp. of Çolakoglu Metalurgi A.S and its Affiliates to Sect. D of the U.S. Dep't of [C]ommerce Antidumping Duty Questionnaire ("Çolakoglu § D QR"), Ex. D-18, Çolakoglu Suppl. CJA Tab 7, CR 102, 112, 114, Çolakoglu Suppl. PJA Tab 7, PR 148-50, 152-53, ECF No. 82; Çolakoglu Reply at 19-20. At oral argument, the Government did not dispute the absence of Çolakoglu's recording of costs associated with excess heat,[39] and instead emphasized the treatment of the sale of excess heat as revenue rather than as an offset to electricity costs. Oral Arg. at 2:38:45-2:40:43.
The record shows that Çolakoglu records the sale of excess heat as a separate line item. See Çolakoglu's Sales Verification Ex. 3, Çolakoglu 2nd Suppl. CJA Tab 1, CR 367-68, Çolakoglu 2nd Suppl. PJA Tab 1, ECF No. 85 (listing income from OVA as revenue).[40] Commerce's interpretation *1325 of the evidence-that recording of the sale of excess heat as revenue rather than an offset supports treatment as a co-product-is reasonable. Çolakoglu simply draws the opposite conclusion from the available evidence. See Çolakoglu Mem. at 34 ("Çolakoglu does not assign costs to excess heat and separately records the revenue from excess heat, all of which underscores the fact [that] excess heat should be treated as a by-product."). Çolakoglu asserts that its treatment of excess heat "is not conditioned on whether excess heat is considered a by-product or a co-product," and questions the relevance of Commerce's joint product distinction to the treatment of excess heat under Turkish GAAP. Id. at 35. Regardless of Çolakoglu's reasons for treating the sale of excess heat as revenue, however, the court must uphold an agency determination that is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huaiyin Foreign Trade Corp. (30) , 322 F.3d at 1374 (citation omitted). Çolakoglu's separate recording of the sale of excess heat is "such relevant evidence" that reasonably, and adequately, supports Commerce's conclusion that the first factor favors treatment as a co-product.[41]
As to the second factor, Commerce found that "the value of the excess heat is significant relative to the value of electricity." I & D Mem. at 17 (citation omitted). Çolakoglu questions the standard by which Commerce measured significance, and asserts that Commerce "never evaluated the relative value of electricity to excess heat." Çolakoglu Reply at 20. As Çolakoglu recognizes, however, it does not assign a market value to electricity because it is consumed by Çolakoglu. Id. Thus, Commerce examined the value of the excess heat relative to the cost of producing electricity. Oral Arg. at 2:41:25-2:43:10; see also Çolakoglu § D QR, Ex. D-12. Although revenue and cost are not equivalent measures, this factor does not require a precise comparison. See I & D Mem. at 17 (considering "the significance of each product relative to the other joint product[ ]," which does not demand an examination of the relative significance each product's value ). The value of excess heat is roughly half the amount of the cost of electricity produced by GT1.[42] A reasonable mind could conclude that the value of the excess heat revenue is sufficiently significant so as to support its treatment as a co-product. See Huaiyin Foreign Trade Corp. (30) , 322 F.3d at 1374. Although Commerce's explanation could have been clearer, the path of its decision is discernible. See NMB Singapore Ltd. v. United States , 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.") (quoting *1326 Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("We will ... uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal quotation marks and citation omitted) ).
In sum, Commerce's consideration of the five factors, and its reliance on the first and second factors in particular, provides substantial evidence to support Commerce's decision to treat excess heat as a co-product rather than a by-product. See 19 C.F.R. § 351.401(b)(1).[43] Accordingly, Commerce's decision to treat excess heat as a co-product will be sustained.
D. Commerce's Calculation of Indirect Selling Expenses
Pursuant to 19 U.S.C. § 1677a(d)(1), Commerce shall reduce a respondent's constructed export price[44] by certain expenses incurred by an affiliated seller in the United States.[45] The statute and the relevant regulation, 19 C.F.R. § 351.401(g), are silent as to how Commerce should calculate indirect selling expenses; thus, Commerce has discretion to fashion a reasonable methodology. See, e.g. , NSK Ltd. v. United States , 29 CIT 1, 17, 358 F.Supp.2d 1276 (2005), aff'd, 162 Fed.Appx. 982 (Fed. Cir. 2006). "Commerce typically allocates indirect selling expenses based on sales value." Micron Tech., Inc. v. United States , 23 CIT 55, 62, 44 F.Supp.2d 216, 223 (1999) ; see also Gov. Resp. at 22 ("Commerce generally uses a relative sales value methodology to calculate a respondent's indirect selling expenses."). Pursuant to this methodology, "Commerce calculates an allocation ratio" by dividing a respondent's total indirect selling expenses (the numerator in this equation) by its total sales value upon which those expenses were incurred (the denominator). Gov. Resp. at 22; see also U.S. Steel Corp. v. United States , 34 CIT 252, 257-58, 712 F.Supp.2d 1330, 1337 (2010) (describing Commerce's relative sales value methodology). Commerce then applies that ratio to the subject merchandise's gross unit price to allocate the indirect sales expenses to each sale. Gov. Resp. at 22.
Here, Çolakoglu's affiliate, Medtrade, Inc. ("Medtrade") assisted Çolakoglu with all of its sales in the United States and North America, and, thus, all of Çolakoglu's U.S. sales were on a CEP basis. I & D Mem. at 8-9. Accordingly, Commerce *1327 calculated Çolakoglu's indirect selling expense ratio on the basis of Medtrade's POI sales and expenses. Id. at 8-9; see also Verification of the U.S. Sales Responses of Çolakoglu Metalurgi A.S. (Metalurgi), Çolakoglu Dis Ticaret A.S. (COTAS), and Medtrade Inc. (Medtrade) ("Çolakoglu CEP Sales Verification Report") at 10-11, CJA Tab 30, CR 463, PJA Tab 30, PR 294, ECF No. 69-1.
Çolakoglu contends that Commerce should instead have allocated Medtrade's indirect selling expenses over sales by Medtrade and COTAS, Çolakoglu's Turkey-based affiliate responsible for direct sales to North America, because some of Medtrade's expenses pertained to Canadian sales. Çolakoglu Mem. at 23-24 & n.5. According to Çolakoglu, its proposed ratio would more accurately reflect the indirect selling expenses incurred on U.S. sales. Id. at 24. Defendant responds that Commerce correctly declined to include COTAS sales in the indirect selling expense denominator because "it would have created a falsely low ratio by including COTAS sales but not COTAS expenses," which were reported elsewhere.[46] Gov. Resp. at 23; see also Def.-Ints.' Resp. at 39-40.
Commerce calculated an indirect selling expense ratio based upon Medtrade's POI sales and expenses encompassing all of North America. See Çolakoglu CEP Sales Verification Report at 10-11. The geographic consistency reflected in the numerator and denominator thus produced a ratio that, when applied to unit price, reasonably allocated the indirect selling expenses to each sale. Including COTAS's sales in the denominator while excluding its expenses from the numerator would, as the Government contends, artificially lower the ratio. Accordingly, Çolakoglu has not demonstrated that Commerce's allocation of indirect selling expenses in this case is unreasonable or unsupported by substantial evidence and it will be sustained.[47]
E. Commerce's Rejection of Corrections to Çolakoglu's International Ocean Freight Expenses
Çolakoglu challenges Commerce's refusal to accept at verification certain "minor corrections" to its reported international freight expenses that consisted of "small discounts on international freight charges." Çolakoglu Mem. at 36. Commerce rejected the corrections on the basis that they "were not minor" because they "affected most of Çolakoglu's U.S. sales." I & D Mem. at 10 & n.32 (citing Verification of the Sales Response of Çolakoglu Metalurji A.S. (Metalurji), Çolakoglu Dis Ticaret A.S. (COTAS), and Medtrade Inc. (Medtrade) ("Çolakoglu Sales Verification Report") at 2, Çolakoglu Suppl. CJA Tab 2, CR 462, Çolakoglu Suppl. PJA Tab 2, PR 292, ECF No. 82). Commerce therefore calculated Çolakoglu's ocean freight on the basis of its questionnaire response. Id. at 10 & n.29 (citations omitted). The Government contends that that Commerce's refusal to accept corrections to Çolakoglu's reported international freight expenses was supported by substantial evidence. Gov. Resp. at 31; see also Def.-Ints. Resp. at 40. The Government is incorrect.
The Sales Verification Report relied on by Commerce to support its rejection of *1328 Çolakoglu's corrections fails to substantiate the nature of the corrections. See Çolakoglu Sales Verification Report at 2. Rather, like the Issues and Decision Memorandum, the Sales Verification Report merely reiterates Commerce's basis for rejecting the corrections. See id. At oral argument, the Government explained that Commerce's verifiers refused to accept the relevant document, so all the record contains is Commerce's explanation for the refusal. Oral Arg. at 2:16:00-2:16:28.
Although Commerce has "discretion to reject substantial new factual information submitted after the deadline for submission of such information," Reiner Brach GmbH & Co.KG v. United States , 26 CIT 549, 560, 206 F.Supp.2d 1323, 1334 (2002), the court must have some basis upon which to review Commerce's decision that the corrections "were not minor."[48] The court cannot accept Commerce's bare conclusion because it is not supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).[49] Commerce's determination will be remanded for reconsideration.
CONCLUSION & ORDER
In accordance with the foregoing, Plaintiffs' respective motions for judgment on the agency record are granted, in part, and denied, in part, and it is hereby
ORDERED that Commerce's Final Determination is remanded for reconsideration or further explanation of Commerce's treatment of Erdemir's date of sale for home market sales as discussed in Section I.B; it is further
ORDERED that Commerce's Final Determination is remanded for reconsideration of Çolakoglu's request for a duty drawback adjustment as discussed in Section II.A; it is further
ORDERED that Commerce's Final Determination is remanded for reconsideration or further explanation of the agency's rejection of Çolakoglu's corrections to international ocean freight expenses, as discussed in Section II.E; it is further
ORDERED that Commerce shall file its remand redetermination on or before June 20, 2018; it is further
ORDERED that subsequent proceedings shall be governed by USCIT Rule 56.2(h) ; it is further
ORDERED that any comments or responsive comments must not exceed 5,000 words; it is further *1329 ORDERED that Commerce's Final Determination is sustained with respect to Erdemir's date of sale for U.S. sales, as discussed in Section I.C; and it is further
ORDERED that Commerce's Final Determination is sustained with respect to Commerce's denial of a quarterly cost-averaging methodology for calculating Çolakoglu's costs of production, Commerce's treatment of excess heat as a by-product, and Commerce's calculation of Çolakoglu's indirect selling expenses, as discussed in Sections II.B-D.

The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 41-4, and a Confidential Administrative Record ("CR"), ECF No. 41-5. Parties submitted joint appendices containing all record documents cited in their briefs. See Public Joint App. ("PJA"), ECF No. 70; Confidential Joint App. ("CJA"), ECF No. 69; Confidential Suppl. App. of Pl. Erdemir, ECF No. 80; Public Suppl. App. of Pl. Erdemir, ECF No. 81; Çolakoglu's Confidential Suppl. App. ("Çolakoglu Suppl. CJA"), ECF No. 82; Çolakoglu's Non-Confidential Suppl. App. ("Çolakoglu Suppl. PJA"), ECF No. 83; Çolakoglu's Confidential Second Suppl. App. ("Çolakoglu 2nd Suppl. CJA"), ECF No. 85; Çolakoglu's Non-Confidential Second Suppl. App. ("Çolakoglu 2nd Suppl. PJA"), ECF No. 86. The court references the confidential versions of the relevant record documents and briefs, if applicable, throughout this opinion.

The Respondent Selection Memorandum identifies Çolakoglu and "Iskenderun Demir Ve Celik" ("Iskenderun") as the mandatory respondents. Respondent Selection Mem. at 5. Iskenderun is Erdemir's subsidiary. See, e.g. , Gov. Resp. at 4.

Additional factual and procedural background is contained in the relevant section when helpful to the analysis.

All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition.

Constructed export price is defined as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," with applicable adjustments pursuant to § 1677a(c) and (d). 19 U.S.C. § 1677a(b).

When, as here, the subject merchandise is sold or offered for sale "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price," normal value is determined on the basis of home market sales. 19 U.S.C. § 1677b(a)(1)(B).

The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

In the Preamble , Commerce further explains that
as a matter of commercial reality, the date on which the terms of a sale are first agreed is not necessarily the date on which those terms are finally established. In [Commerce's] experience, price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced. The existence of an enforceable sales agreement between the buyer and the seller does not alter the fact that, as a practical matter, customers frequently change their minds and sellers are responsive to those changes. [Commerce] also has found that in many industries, even though a buyer and seller may initially agree on the terms of a sale, those terms remain negotiable and are not finally established until the sale is invoiced.
62 Fed. Reg. at 27,348-49.

The Government contends this court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") have affirmed Commerce's consideration of payment terms as material terms in the date of sale analysis. Gov. Resp. at 39 (citing, inter alia , Sahaviriya Steel , 34 CIT 709, 714 F.Supp.2d 1263, which the Federal Circuit affirmed, 649 F.3d 1371 ). In Sahaviriya Steel , the CIT favorably referenced Nakornthai III , noting that price, quantity, delivery terms and payment terms were among the terms of sale regarded as "material" by Commerce. 34 CIT at 727, 714 F.Supp.2d at 1280 ; see also Nakornthai Strip Mill Public Co. Ltd. v. United States ("Nakornthai III "), 33 CIT 326, 614 F.Supp.2d 1323 (2009). On appeal to the Federal Circuit, however, the only issues challenged were whether Commerce properly conducted a changed circumstances review and exercised its authority pursuant to a partial revocation. See Sahaviriya Steel , 649 F.3d at 1372-73.

Each coil weighs around 25 tons. See Erdemir § A QR, Ex. A-10 at 1 (sample home market sales invoice).

Erdemir explains that, for example, receiving "100 dollars today is equivalent to, say, 102.5 dollars at 90 days assuming the term-payment interest rate is 10 percent (100*10%*90/360=2.5)." Erdemir Mem. at 19 (citing Hr'g Tr. (June 23, 2016) ("Hr'g Tr.") at 79-80, CJA Tab 36, PJA Tab 36, PR 319, ECF No. 69-2). Thus, according to Erdemir, "whether the customer elects to pay $100 today or $102.50 in 90 days is immaterial." Id.

Erdemir discusses economic equivalence in the context of a hypothetical 100 USD sale, which it supports by way of reference to a general discussion at Commerce's hearing in the underlying administrative proceeding. See Erdemir Mem. at 19 (citing Hr'g Tr. at 79-80); supra note 11. Commerce did not reject Erdemir's proposed date of sale on the basis of non-equivalence. See I & D Mem. at 26. Because it is unclear whether the record contains actual evidence establishing the economic equivalence of the cash and credit payment terms, the degree to which this principle supports Erdemir's proposed date of sale is also unclear.

The Nakornthai III court nonetheless sustained Commerce's date of sale determination on the basis of its factual findings regarding the significance of changes to payment and delivery terms, which were supported by substantial evidence. 33 CIT at 338, 614 F.Supp.2d at 1334. Specifically, a change to a payment term permitted Nakornthai to receive a large portion of its payment earlier than the date set in the contract, while changes to the letter of credit's expiration date and last shipment dates gave Nakornthai additional time to ship the subject merchandise "while still being entitled to full payment." Id. (citations omitted). The court noted, however, that it was not affirming "Commerce's finding [ ] merely because these material contractual terms were amended," but on the basis of Commerce's "requisite factual findings of significance with regard to the change in payment and delivery terms." Id. In contrast, here, the optional payment term is not changed or renegotiated, and Commerce has not made any factual findings regarding significance. See Domestic Terms & Conditions ¶ 9.4; I & D Mem. at 26; Erdemir Mem. at 18 (the Domestic Terms & Conditions do not "leav[e] room for renegotiating or changing the payment terms").

Erdemir also points to the overall 0.06 percent quantity leeway for all U.S. sales as demonstrating the "insignifican[ce]" of any quantity variance. See, e.g. , Erdemir Mem. at 23. Because the pertinent inquiry focuses on when the contracting parties had a meeting of the minds as to their respective contracts, volume differences calculated on the basis of all U.S. sales are irrelevant, and the court has-correctly-rejected a similar argument in the past on the basis that it "would render meaningless the quantity tolerance levels negotiated by the contracting parties." See Sahaviriya Steel , 34 CIT at 729, 714 F.Supp.2d at 1281.

At oral argument, Erdemir abandoned its argument that the contract provisions permitting partial shipments resolved any quantity differences. See Erdemir Mem. at 22; Oral Arg. at 43:40-45:42.

Defendant-Intervenors also contend that Erdemir used inconsistent language to describe the triggering event giving rise to the date of sale. See Def.-Ints. Resp. at 19-20. Commerce did not rely on any inconsistent language to support its determination. See I & D Mem. at 27. Additionally, Erdemir defined the date of sale for U.S. sales as the "contract date," and "reported its pro[ ]forma invoice date as the date of contract" in the "CONDATEU" field. Sect. C Questionnaire Resp. of Eregli Demir ve Çelik Fabrikalari T.A.S. and Iskenderun Demir ve Çelik A.S at 17, CJA Tab 4, CR 78-79, PJA Tab 4, PR 141, ECF No. 69; see also Erdemir § A QR at 19. The "CONDATEU" field in each of Erdemir's sales verification exhibits correspond to Erdemir's final signature date on the pro forma invoice. See Sales Verification Exs. ("SVE") 11-14, CJA Tab 28, CR 336, 343-55, PJA Tab 28, PR 273, ECF No. 69-1. Accordingly, Defendant-Intervenors' argument lacks merit.

In Erdemir's Final Analysis Memorandum, Commerce explained that [ [ ] ] out of [ [ ] ] pro forma invoices failed to reflect letters of credit that were opened within the requisite [ [ ] ] days, covering [ [ ] ] out of [ [ ] ] sales to the United States. Final Analysis Mem. for Eregli Demir ve Çelik Fabrikalari T.A.S. and its Affiliates ("Erdemir Final Analysis Mem.") at 3, CJA Tab 39, CR 478, PJA Tab 39, PR 323, ECF No. 69-2 (citing, inter alia , Erdemir 2nd Suppl. § BC QR, Ex. SBC-21).

Commerce's reliance on different document dates, however, lacks merit. Commerce opined that a handwritten date replacing a printed date on one of the pro forma invoices "indicates that either the material terms changed at the last minute, or were not yet finalized when the document was signed." I & D Mem. at 27 & n.139 (citing SVE 11). The pro forma invoice associated with SVE 11 shows an original printed date of 11/6/2014, which was crossed out and replaced with a handwritten date of 11/7/2014. See SVE 11. However, Commerce does not explain why the amended document date suggests that the material terms changed or were not final when the pro forma was signed on the later date. See id. ; Pro Forma, Misc. ¶ 1 (stating that the sale is confirmed when the pro forma invoice is signed by Erdemir).

Commerce identified pro forma invoice number [ [ ] ] as the invoice at issue, Erdemir Final Analysis Mem. at 3 & n.3, which corresponds to the pro forma invoice associated with SVE 11, see SVE 11. Commerce's reference to the "[two] pro forma invoices in this exhibit" is, however, mistaken. Erdemir Final Analysis Mem. at 3 & n.3. SVE 11 contains one pro forma invoice numbered [ [ ] ], with content spanning two pages. See SVE 11.

At oral argument, Erdemir asserted that the first of Erdemir's signatures represents the date on which Erdemir made the offer, which was then sent to the customer, who then signed and returned the pro forma invoice for Erdemir's final, and confirmatory, signature. Oral Arg. at 51:00-52:09. Even if true, this explanation is not supported by the record evidence that was before Commerce. Had the customer dated its signature sometime between November 12 and 17, the date of Erdemir's "final confirmation" may have been self-evident. Because the customer does not appear to have dated the document, Commerce had no way of knowing that Erdemir signed the pro forma before sending it to the customer and upon its return. See SVE 11.

Erdemir signed the other pro forma invoices on a single date. See SVE 12-14. However, it would be impractical to expect Commerce to arrive at different date of sale determinations for different sales, particularly when each review may encompass multiple sales. See Toscelik , 256 F.Supp.3d at 1263.

Commerce specifically asked Çolakoglu to provide (1) copies of the relevant Turkish IPRs ("Inward Processing Regime"); (2) an excerpt from the Turkish Customs code describing a particular HS ("Harmonized System") code supporting "the amount of the import duty rate"; (3) a detailed explanation of Çolakoglu's calculation with supporting documentation; (4) an explanation of Çolakoglu's linkage of its total exports included in the calculation to each "specific IPR number"; (5) documentation "link[ing] the duty drawback and the exempted duties directly to specific U.S. sales"; and (6) further explanation regarding the total export quantity "reported in Çolakoglu's Section C U.S. sales database." Çolakoglu Third Suppl. § BC Questionnaire at 6. Commerce also asked Çolakoglu to clarify whether it procures slab from Turkish or foreign sources (or both).Id.

"DIIBs" is another term for Turkey's Inward Processing Regime. Prelim. Mem. at 13.

As noted by the Government, the Federal Circuit has affirmed Commerce's denial of a duty drawback adjustment even though the Turkish Government granted certain imports duty free status. See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S. , 861 F.3d 1269 (Fed. Cir. 2017). In that case, however, the respondent's imports were incapable of use in the subject merchandise. Id. at 1271. Instead, the Turkish Government granted duty free status on the basis of equivalency, "whereby similar products may be substituted for each other for drawback purposes." Id. at 1271-72.

Citations to the oral argument reflect time stamps from the recording.

Commerce also faults Çolakoglu for failing to "request[ ] an opportunity to place new factual information ... on the record prior to the Preliminary Determination ." I & D Mem. at 7. It was not until the Preliminary Determination , however, that Commerce alerted Çolakoglu to the deficiencies with regard to its documentation. See Prelim. Mem. at 13.

The Government cites NSK Ltd. v. United States , 17 CIT 590, 593, 825 F.Supp. 315, 319 (1993) and Chinsung Indus. Co. v. United States , 13 CIT 103, 106-07, 705 F.Supp. 598, 601 (1989) in support of the proposition that 19 U.S.C. § 1677m(d)"must be read in the context of a respondent's burden to prepare and provide Commerce with an accurate submission within the prescribed statutory deadline." Gov. Resp. at 16. Neither case, however, addresses § 1677m(d) or otherwise recognizes any limitations on the statute's mandatory language. The Government also relies on Papierfabrik August Koehler SE v. United States , 843 F.3d 1373 (Fed. Cir. 2016), as support for the proposition that Çolakoglu "was, or should have been [aware]" of the deficiencies. Gov. Resp. at 17. Papierfabrik , however, relied on the respondent's actual awareness of certain deficiencies caused by its intentionally fraudulent responses to affirm Commerce's decision not to issue a supplemental questionnaire pursuant to § 1677m(d). 843 F.3d at 1384. As the Government recognizes, the instant case does not involve fraud, Gov. Resp. at 17, and Papierfabrik does not support a finding that § 1677m(d) is limited by what a respondent "should have" known. Finally, the Government points to a respondent's burden to provide complete translations pursuant to 19 C.F.R. § 351.303(e). Gov. Resp. at 17. However, Commerce did not rely on Çolakoglu's purported failure to comply with the regulation when it declined the adjustment, and in fact, considered those portions of certain documents that were legible as part of its decision to deny the adjustment. See I & D Mem. at 5-6.

The court's finding is based on the particular facts of this case in which only one or two pages of a multi-page exhibit were difficult to read and a substantial portion of each document was translated. Defendant does not suggest that any asserted shortcomings were intentional and this would appear to be a textbook case for why § 1677m(d) exists-to ensure that respondents have an opportunity to address minor deficiencies in the course of a proceeding.

The Government confirmed at oral argument that Commerce does not have such a policy. Oral Arg. at 1:37:10-1:37:20. The Government also asserted that Commerce had discretion to verify the document's source at verification, but that the duty drawback issue as a whole was not verified. Oral Arg. at 1:37:40-1:38:37. Commerce's decision not to verify duty drawback is discussed infra .

Commerce relied, in part, on a discrepancy in the values of imported slab for IPR 2923. I & D Mem. at 5 n.17. That "discrepancy," however, appears to stem from Çolakoglu's rounding of the value. Compare Çolakoglu 3rd Suppl. § BC QR Part II, Ex. SBC-13a (IPR 2923, p.1 (referring to an import value of $[ [ ] ] ), with id. , Ex. SBC-13c at p.7 (referring to an import value of $[ [ ] ] for IPR 2923).

The import and export quantities contained in the IPR supporting documents (page 6 of each IPR) do not correspond to the import and export quantities stated in Çolakoglu's duty drawback calculation worksheet. See Çolakoglu 3rd Suppl. § BC QR Part II, Exs. SBC-13a, SBC-13c at p.7.

By statute, Commerce
shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements ... if-
(1) the information is submitted by the deadline established for its submission,
(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
(5) the information can be used without undue difficulties.
19 U.S.C. § 1677m(e).

Section 1677b defines the cost of production as an amount equal to
(A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;
(B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and
(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.
19 U.S.C. § 1677b(b)(3).

Commerce conducts this analysis "on a CONNUM-specific basis." Gov. Resp. at 25; see also I & D Mem. at 14. A "CONNUM" is a control number assigned to materially-identical products to distinguish them from non-identical, i.e., similar, products. Gov. Resp. at 25 n.2.

Commerce compared the cost of production for the highest and lowest cost quarters for 10 CONNUMs representing Çolakoglu's five "most frequently sold home and U.S. market CONNUMs during the POI." Cost of Production and Constructed Value Calculation Adjustments for the Final Determination-Çolakoglu Metalurgi A.S and its Affiliates ("Çolakoglu Final Cost Calc. Mem.") at 2 & Attach. 1, CJA Tab 40, CR 497, PJA Tab 40, PR 327, ECF No. 69-2. That analysis shows that none of the 10 CONNUMs "exceeded the 25 [percent] significance threshold." Id. at 2, Attach. 1.

In other words, Commerce generally subtracts the revenue derived from the sale of by-products from the costs of production, thereby lowering the normal value and, potentially, lowering the antidumping margin that is derived from the difference between normal value and CEP. See Arch Chemicals , 2011 WL 1449034, at *2 ; Magnesium Corp. of America v. United States , 20 CIT 1092, 1106, 938 F.Supp. 885, 899 (1996) ; Çolakoglu Mem. at 32 (distinguishing the consequences of Commerce's treatment of by-products and co-products). If, however, a joint product is considered a co-product, costs are allocated to the sales revenue from the sale of the co-product, which decreases the offset to normal value. See Çolakoglu Mem. at 32.

In the Issues and Decision Memorandum, Commerce used the National Association of Accountants' ("NAA") definition of joint product "as two or more products so related that one cannot be produced without producing the other(s), each having relatively substantial value and being produced simultaneously by the same process up to a split-off point." I & D Mem. at 16 (citations omitted). Joint products include "major products, by-products, and co-products." Id. "The NAA defines a by-product as a secondary product recovered in the course of manufacturing a primary product, whose total sales value is relatively minor in comparison with the sales value of the primary product(s)." Id. In contrast, "[w]hen two or more major products appear in the same group, they are called co-products." Id. "Products of greater importance are termed major products and products of minor importance are termed by-products." Id. ; see also IPSCO, Inc. v. United States , 12 CIT 384, 388, 687 F.Supp. 633, 636 (1988) (noting Commerce's reliance on "the importance of a product to the overall economic activity of its producer and the product's value in relationship to the value of the primary product" to distinguish by-products from co-products).

Commerce found that the facts relevant to the third through fifth factors were not indicative of either treatment. I & D Mem. at 17-18. As to the third factor, Commerce found no evidence indicating whether excess heat production is unavoidable. Id. at 17. Çolakoglu asserts that excess heat production is inevitable, but it cites no record evidence. Çolakoglu Reply at 20. Commerce concluded that the fourth factor was neutral because there was no record evidence demonstrating that Çolakoglu's management intentionally controlled the amount of excess heat produced. I & D Mem. at 18. Çolakoglu misconstrues Commerce's finding on this issue. See Çolakoglu Reply at 20. Commerce also concluded that the fifth factor was neutral because "both the electricity and the excess heat ... required minimal to no additional processing ... after the split-off point." I & D Mem. at 18. Çolakoglu contends that "excess heat requires significant further processing to generate electricity." Çolakoglu Reply at 21. Çolakoglu acknowledges, however, that excess heat "is not a product but a fuel source for a steam turbine." Id. Thus, although it may take "significant further processing" to produce electricity from excess heat, the excess heat itself is not further processed before becoming a source of value. See I & D Mem. at 18 (describing the implications of further processing after the split-off point).

To the extent the Issues and Decision Memorandum states otherwise, the Government concedes that it is incorrect. Oral Arg. at 2:38:45-2:39:09.

Çolakoglu asserts that it "books the excess heat as an offset to its electricity costs." Çolakoglu Reply at 19 (citing Çolakoglu § D QR at D-21). The cited document contains Çolakoglu's narrative response, which further references Exhibit D-12 appended to the questionnaire response for Çolakoglu's "calculation of the excess heat offset." Çolakoglu § D QR at D-21. Exhibit D-12 is precisely that-Çolakoglu's own calculation of the offset for the POI-and is not, in fact, a representation of the manner in which Çolakoglu maintains its books and records. See Çolakoglu § D QR, Ex. D-12.

That Çolakoglu does not assign costs to excess heat does not change the outcome. Even assuming, arguendo , that one would expect to find costs associated with a co-product, the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. See Matsushita , 750 F.2d at 933.

For the POI, Çolakoglu earned [ [ ] ] TL (Turkish Lira) in revenue for the sale of excess heat, and incurred [ [ ] ] TL in costs to produce electricity at GT1. Çolakoglu § D QR, Ex. D-12.

Commerce also points to "the [significant] amount of kilowatts of excess heat generated in relation to the electricity generated at Çolakoglu's GT1." I & D Mem. at 17 (citation omitted). The record before the court, however, does not clearly indicate the measure of excess heat. Rather, the record only shows the amount of electricity produced by OVA's steam turbine from Çolakoglu's excess heat, measured in kilowatts. See Çolakoglu Final Cost Calc. Mem., Attach. 2. The significance of this value for purposes of the issue under consideration is unclear; however, this lack of clarity is not dispositive because the court finds Commerce's determination as to the second factor adequately supported by its finding with regard to the value of the excess heat.

Sales are made on a CEP basis when the "subject merchandise is first sold ... in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b).

In full, § 1677a(d)(1) instructs Commerce to reduce CEP by the amounts incurred by an affiliate for:
(A) commissions for selling the subject merchandise in the United States;
(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
(C) ) any selling expenses that the seller pays on behalf of the purchaser; and
(D) ) any selling expenses not deducted under subparagraph (A), (B), or (C).
19 U.S.C. § 1677a(d)(1).

COTAS expenses were reported in a separate field capturing "indirect selling expenses incurred in the country of manufacture." Çolakoglu CEP Sales Verification Report at 10.

Çolakoglu alternatively contends that Commerce should reset indirect selling expenses for U.S. sales by COTAS to "zero" in order to "offset the distortive effect of not including Çolakoglu's direct U.S. sales in the [indirect selling expense] ratio denominator." Çolakoglu Mem. at 24 & nn.6-7. Because the court has not found any distortion in Commerce's indirect selling expense ratio, it need not address Çolakoglu's proposed remedy.

The purpose of verification is "to verify the accuracy and completeness of submitted factual information." Jinko Solar Co., Ltd. v. United States , 41 CIT ----, ----, 229 F.Supp.3d 1333, 1356 (2017) (quoting 19 C.F.R. § 351.307(d) ). Commerce therefore accepts new information at verification "only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record." Id. (citation omitted);

According to the Government, because Çolakoglu does not dispute the factual basis underlying Commerce's decision (i.e., that the corrections affected most of Çolakoglu's U.S. sales), and only challenges the conclusion Commerce drew from that factual basis, the document's absence from the record is not dispositive. Oral Arg. at 2:17:22-2:18:03. The court disagrees. Even assuming, arguendo , that the corrections affected the majority of Çolakoglu's U.S. sales, it does not necessarily follow that the corrections were-or were not-minor. That determination is inherently fact-specific and raises questions, for example, about the precise nature of the discount and whether its acceptance would have required a single recalculation of the freight applicable to each sale or transaction-specific recalculations. Because the court is unable to address those questions, Commerce's decision must be remanded.